**In re O.J. OSBORN, SSN 458–48–1065, Roma Lou Osborn, SSN 443–36–5534, Debtors.**

**Bankruptcy No. 87–71480.**

United States Bankruptcy Court,
E.D. Oklahoma.

Dec. 29, 1994.

Kenneth G.M. Mather, Trustee, Tulsa, OK.

Keith J. Hocker, Norman, OK, for debtors.

Mark Craige, Tulsa, OK, for Durant Bank & Trust.

---

### ORDER

TOM R. CORNISH, Bankruptcy Judge.

On the 12th day of October, 1994, the above-referenced matter came on for trial after the case was remanded to this Court by the Tenth Circuit, *In re Osborn*, 24 F.3d 1199 (10th Cir.1994) and the United States District Court for the Eastern District of Oklahoma. Counsel appearing were Mark Craige and Jim Hicks for Durant Bank & Trust and Keith Hocker and Greg Tontz for the Debtors. Both parties have filed proposed findings of fact and conclusions of law. After hearing testimony, arguments of counsel, and reviewing the file, this Court does hereby enter the following findings and conclusions in conformity with Rule 7052, Fed.R.Bankr. P., in this core proceeding:

### PROCEDURAL HISTORY

In 1956, the Osborns purchased and claimed as their homestead property located 10818 Lake June Road, Dallas, Texas ("the Texas property"). The Osborns continued to reside there until they were required to leave by the U.S. Marshal after the sale of the property in January, 1991. The Osborns purchased property in southeast Oklahoma beginning in 1959 ("the Oklahoma property"), with the intent to reside there and enter into the farming business once Mr. and Mrs. Osborn retired. The Oklahoma property was mortgaged to Durant Bank & Trust ("DB & T" or "Bank").

The Osborns filed a Chapter 12 proceeding on July 9, 1987. After the Bank objected, the action was subsequently dismissed. The Bank filed an involuntary Chapter 7 proceeding against the Osborns on December 30, 1987 which was converted to Chapter 11 and thereafter reconverted back to Chapter 7. During the Chapter 11 case, the Osborns filed their original Schedule B–1 listing their real property. The Texas property was valued at $70,000 and a piece of rural property in Oklahoma was valued at $238,950. The Tenth Circuit noted in its opinion that many of the documents relating to the loans on the Oklahoma property listed an Oklahoma address for the Osborns. The original schedules in the Chapter 12 and this Chapter 7 proceeding listed the Oklahoma property as the Osborns' mailing address. The original bankruptcy petitions listed the Osborns' mailing address as Route 2, Box 118, Bokchito, Oklahoma. Mrs. Osborn later testified that she thought that she was to give the Oklahoma address because they were filing a business bankruptcy, which was connected to the Oklahoma property.

In the appellate record before the Tenth Circuit, Mrs. Osborn had testified that she had made no express representation that the Oklahoma property was her homestead. She further testified that she had no understanding of the legal meaning of the word "homestead." On the other hand, Mr. Osborn had testified on several occasions that the Okla-

homa property was his homestead. He even testified at the first meeting of creditors that he and his wife lived on the property in Oklahoma.

The Tenth Circuit also had before it the circumstances regarding the adequate protection lien on the Texas property. On July 6, 1988, the Bankruptcy Court granted the Bank an adequate protection lien on the Texas property, and allowed the Debtors to use cash proceeds from the sale of some of their cattle in order to maintain the herd, which was subject to the security interest of the Bank. The Osborns used over $11,000 of these proceeds. Notably, the Osborns did not object to that lien being put on the Texas property nor did they argue that the property was their homestead.

The Bank filed an adversary proceeding seeking to deny the Osborns a discharge of their debt to the Bank. On January 9, 1990, an agreed journal entry of judgment was entered which provided that a debt of $225,-000 to the Bank was nondischargeable and the parties asked Farmers Home Administration to reguarantee the loan. The judgment provided that if Farm Home did not reguarantee the loan, then the Bank had the right to execute upon the judgment and take other legal action as it deemed reasonable. Farm Home refused to reguarantee the loan.

The Osborns then filed an amendment to their Schedule B–4 which claimed the Texas property as exempt. The Bankruptcy Court denied the amendment and the Debtors appealed. The District Court affirmed the Bankruptcy Court's decision and the Debtors appealed to the Tenth Circuit. The Tenth Circuit found:

(1) The Osborns' appeal was not moot in light of the sale of the Texas property to a third party. The Tenth Circuit noted that where state law or the Bankruptcy Code provides some remedy that does not affect the validity of the sale, § 363(m) of the Bankruptcy Code does not moot the appeal.

(2) In this case, the showing of prejudice was not sufficient to deny the amendment under Rule 1009. The Tenth Circuit noted:

The bankruptcy court's order here is not clear whether there was merely a procedural denial of the amendment, or whether the homestead claim was rejected on the merits. In any event we hold that, insofar as the bankruptcy court's order was a denial of the procedural right to amend, the ruling was in error. That is not the end of the matter, however. "Whether the claims of exemption contained in that amendment will be approved if an interested party timely objects, however, is a separate issue." *Redmond* [*v. Tuttle*], 698 F.2d [414] at 417 [ (10th Cir.1983) ].

(3) The Tenth Circuit further stated:

We feel the fashioning of such a remedy should first be considered by the bankruptcy judge. Moreover, the present record is inadequate for the making of a determination about possible relief for the Osborns, and the weighing of the equities relating to impressing a trust on the proceeds from the sale of the Texas property or to the extent of monetary relief that should be given to the Osborns from those proceeds or from the party that received them. The bankruptcy court should conduct proceedings to consider the equities and the fashioning of relief, consistent with this opinion.

The denial of the amendment was reversed by the Tenth Circuit and remanded.

The Tenth Circuit noted that the Bankruptcy Court entered an order allowing the Trustee to sell the Texas property. The Bankruptcy Court stayed the sale of the Texas property on the condition that the Osborns maintain insurance on the property and pay "reasonable rent" of $450 per month to the Bank. The reasonable rate of $450 per month was agreed to by Mrs. Osborn at a bankruptcy hearing and was not appealed. The Osborns failed to comply with the conditions and the Trustee sold the Texas property at auction for $27,000. As a result of this case being remanded back to this Court, this Court held a full day trial where the following evidence was received.

## FACTS BEFORE THE BANKRUPTCY COURT ON REMAND

Mrs. Osborn testified that in 1956, she and Mr. Osborn purchased the property known as 10818 Lake June Road, Dallas, Texas and

resided there until 1991. Mr. and Mrs. Osborn had never been separated or divorced. In 1965, Mrs. Osborn began working for Proctor and Gamble in Dallas. At first, she only worked part-time and in 1962, she began working full-time. She continued her employment with Proctor and Gamble until she was laid off in 1992. She testified that her children attended schools in Texas although her youngest son moved to Oklahoma to live with her oldest son to finish high school. Mrs. Osborn testified that she and her husband first acquired property in Oklahoma in 1959 and later continued to acquire land in Oklahoma. In 1987, they owned 498 acres in Oklahoma subject to the Bank's mortgages.

In 1987, the Osborns filed for relief under Chapter 12 of the Bankruptcy Code. At that time, there was no dwelling on the Oklahoma property. The Bank presented documents filed in these bankruptcy proceedings which listed the Osborns' address as Route 2, Bokchito, Oklahoma. Mrs. Osborn testified that this was their business address and she believed that address needed to be on the documents since they were filing a business bankruptcy in Oklahoma. However, she did testify that they received correspondence from the Bank at the Dallas address. Furthermore, Mrs. Osborn testified that their financial statements and tax returns included the Dallas address.

Mrs. Osborn testified as to the expenses they were entitled to be reimbursed for as a result of the sale of the Texas property. The Osborns are claiming $600 for moving expenses; rent in Dallas after the eviction for 18 months at $600 per month for a total of $10,800; storage in Dallas of $70 per month for 18 months for a total of $1,260; storage of furniture in Oklahoma at $45 per month for 27 months for a total of $1,215; and rent in Oklahoma at $300 per month for 26 months for a total of $7,800. When they moved out of the Dallas home in 1991 for failure to pay the $450 per month rent, they moved into a $600 per month apartment. Mrs. Osborn testified that the house they were renting in Oklahoma belonged to their son and they have not paid any rent to their son as of the date of the trial even though they want reimbursed for $7,800.

Evidence was presented that the Debtors' loan documents with the Bank did not reflect that the Texas property was their homestead. Further, the promissory note lists the Debtors' address in Bokchito, Oklahoma and it does not reflect that the address is a business address.

The Debtors' original Chapter 11 Petition and Schedules listed their real property as follows:

| Description | Value |
| --- | --- |
| 10818 Lake June Rd. Dallas, TX | $ 70,000 |
| 498 acres | $238,950 |

On Schedule B–4, the Debtors listed their homestead in Texas as exempt pursuant to Okla.Stat. tit. 31, § 1 (West 1991) and having a value of $70,000.

However, at the § 341 meeting, Mr. Osborn testified that he had lived in the Eastern District of Oklahoma for 180 days. (See, DB & T's Exhibit 12, p. 2, lines 21–23). He further testified that at the time of filing the petition he maintained his residence in Bokchito, Oklahoma. Id. at p. 3, lines 15–17. On cross-examination by DB & T, Mr. Osborn testified that his wife lived on the Bryan County property with him. Id. at p. 5, lines 24, 25; p. 6, lines 1–4. He specifically testified as follows:

Q. Okay. Now on your Schedule 34 [sic] where you've claimed certain property is exempt, it doesn't show a legal description but I think it looks like you're trying to claim the homestead in Dallas as exempt, or do you intend your property in Oklahoma to be exempt homestead?

A. I intend to claim my property in Oklahoma as my exempt homestead.

Id. at p. 6, lines 8–14. This Court entered an Order Allowing Use of Cash Collateral on July 6, 1988, which provided that a lien would be placed on the Texas property. No complaint was made at that time that the property was the Debtors' homestead. Also, it appears that the Debtors at one time agreed to deed the house in Dallas, Texas to the Bank for a $50,000 credit. (See DB & T's Exhibit 18). Again, the Debtors did not object to the giving up of the Texas property because it was their homestead. Furthermore, in a pleading prepared and signed by

the Debtors in a Bryan County, Oklahoma suit against DB & T, the Debtors stated the "Durant Bank & Trust Company took certain security interest on Plaintiffs' [Debtors'] principal dwelling ..." (See, DB & T's Exhibit 14).

Mr. Osborn testified at the Chapter 11 meeting of creditors that he did testify that his residence was in Bokchito, Oklahoma. However, at the hearing before this Court, he testified that it was his intent to reside there in the future and it was his intent to claim the Oklahoma property as exempt in the future. The Debtors presented evidence of their 1986 and 1988 tax returns which reflected an address of 10818 Lake June Road, Dallas, Texas. Gary Forbis, Executive Vice–President of Durant Bank & Trust, testified that over the course of the years in which the Osborns had done business with the Bank, correspondence had been sent to the Debtors at the Dallas address. Further, Mr. Forbis knew that the Debtors' residence was in Dallas but he did not know why mail was not sent to the Bokchito address, which was included on some of the loan documents. Additionally, the Debtors' tax returns reflect an address of 10818 Lake June Road, Dallas, Texas.

In reference to the value of the Texas property, Mr. Osborn testified that he did not know why it was valued at $70,000 when it had been appraised at a value lower than that. Id. at p. 20, lines 16–25; p. 21, lines 1– 6. Mrs. Osborn testified that she believed the value of the property to be between $60,000 and $70,000; however, she would defer her opinion to that of the appraisers. Evidence was presented by both parties as to the value of the Texas property. The Debtors presented expert testimony of Mike McClellan who is an appraiser in Dallas. He testified that he looked at comparables which sold between October 1990 and March 1991. His conclusion was that the house had a historical value of $55,000. However, on cross-examination, he admitted that he did not inspect the interior of the house nor closely inspect the exterior. He did not talk to the current owners of the house. He merely drove up to the front and made a visual inspection from there. Mr. McClellan further testified that the fact the house was

located on a four lane divided street did not make any difference in the value of the house.

The Bank presented expert testimony of Ralph Segers, who is a licensed real estate broker in Texas. He testified that he was familiar with the property since the Trustee had employed him to sell the subject property. He testified that he thought the property would bring between $25,000 and $30,000 at auction. In fact the sales price at auction was $27,000. The house needed a roof and Mr. Segers testified that the house was not in a desirable area. The Bank further presented testimony of Robert Pielsticker. He testified that he used comparable sales within a one mile square area. He testified that he believed the market value of the house was $37,000. He testified sales in the area were in the $30,000s. Mr. Pielsticker testified that the Debtors' appraiser had to go a considerable distance from the subject property in order to obtain his comparables. Mr. Pielsticker testified that it is preferable to locate comparables within the neighborhood.

At the time of the § 341 meeting, Mrs. Osborn had been working for Proctor and Gamble in Dallas for twenty-five years. It seems ironic to this Court that she could not appear for the § 341 meeting because of work when the Bankruptcy Code specifically sets forth that one of the Debtor's duties is to appear and be examined. 11 U.S.C. § 341, see also, Id. at pp. 28, lines 17–19.

The Debtors claimed a homestead exemption on the Oklahoma property until 1987. O.J. Osborn then initiated a Complaint of Erroneous Assessment and Petition for Correction in Bryan County, Oklahoma. After a hearing on the complaint, the Debtors were allowed to claim the Bryan County property as exempt in 1987. Furthermore, the Debtor, O.J. Osborn, signed a Voter's Registration Card, under the penalty of perjury, that he was a resident of the United States and Oklahoma. The Bank presented evidence that the Debtor, O.J. Osborn, voted in Oklahoma in 1982, 1984, 1986 and 1988. It is also noteworthy that in a state court action in Bryan County, Oklahoma, the Debtors filed pro se a "Notice of Rescission Against the

Liens and Mortgages" on October 4, 1990. That document stated, in pertinent part:

> In support of this Notice that O.J. Osborn and Roma Lou Osborn set out, and prior Notes, Durant Bank & Trust Company took certain security interest in Plaintiffs' principal dwelling ... Within twenty days after this notice, Durant Bank & Trust Company is requested to file those documents that are necessary to release all the liens and mortgages.

(*See* DB & T's Exhibit 14)

This document was signed both by O.J. Osborn and Roma Lou Osborn.

## CONCLUSIONS OF LAW

A. The first issue that must be addressed is whether any relief may be fashioned. The Tenth Circuit held that this Court must look to Texas law to determine whether there are remedies available to the Osborns that would not affect the validity of the sale. *In re Osborn*, 24 F.3d at 1204. Further, the Tenth Circuit determined that the Debtors' position in seeking monetary relief for the loss of their homestead has support based on a constructive trust theory in Texas law. *Id.* The Supreme Court of Texas in *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974), as cited by the Tenth Circuit, discussed the "constructive trust" principles by stating "[c]onstructive trusts, being remedial in character, have a very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice." Moreover, the court in *Meadows* agreed that a constructive trust on unidentifiable proceeds was inappropriate. *Id.* at 129. *Restatement of Restitution § 160 (1937)* provides:

> Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

█ In the instant case, there are no identifiable proceeds remaining from the sale of the Texas property. The funds have been distributed to the interested parties, including the auctioneer and the Bank. As a result, no constructive trust can be imposed. Therefore, the issue becomes whether the merits of this case warrant a money judgment in favor of the Debtors against the Bank or other third parties. The award of a money judgment is within the equitable power of this court. *Osborn* at 1204. *Section 74 of the Restatement of Restitution (1937)* provides that:

> A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess.

The best available remedy in this case would be a money judgment based on a right to restitution, if any.

█ The Tenth Circuit determined that procedurally the Debtors had a right to amend their schedules before the bankruptcy case is closed. *Osborn*, 24 F.3d at 1206; *see also*, Fed.R.Bankr.P. 1009(a). Therefore, this Court must weigh the equities to determine whether there should be a trust imposed on the proceeds from the sale or whether any monetary relief should be given to the Debtors. However, the Tenth Circuit did hold "that the rejection of the homestead claim of the Osborns respecting the Texas property was in error," when discussing whether the Debtors were estopped from claiming the Texas property as their homestead.

After hearing all the evidence, this Court is not inclined to allow the Debtors to recover for the total loss of their alleged homestead in Dallas, Texas. The Debtors apparently have played fast and loose with the facts in order to confer upon themselves the most desirable result by claiming the Oklahoma property as exempt which had the effect of lowering the ad valorem taxes on the Bokchito property. Bryan County officials allowed the property to be exempt despite the fact that there was not even a dwelling on the property, which was in error.

█ B. It is well settled in Texas law that the person seeking homestead protection has the initial burden to establish the

homestead character of the property. *Bradley v. Pacific Southwest Bank (In re Bradley)*, 960 F.2d 502, 507 (5th Cir.1992) *(citing Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 314 (Tex.Ct.App.1983 writ ref'd n.r.e.)). To meet this initial burden, the person claiming the homestead must show a "combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as a homestead." *Id. (quoting Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex.Civ.App. 1976, writ ref'd n.r.e.)). The initial burden is a relatively easy burden. *Id.* As long as the person claiming homestead can show that he has used the property as homestead, that will suffice for the Texas courts to presume that the homestead claimant possesses the requisite intent. *Id.* Once the person claiming the homestead protection has met his initial burden of proof, then the burden shifts to the creditor to disprove the existence of the homestead. *Id.*

C. Texas Constitution Art. 16 § 50 protects the homestead as follows:

> The homestead of a family, or of a single adult person, shall be and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of the purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon, and in this last case only when the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead nor may the owner or claimant of the property claimed as homestead, if married, sell or abandon the homestead without the consent of the other spouse, given in such a manner as may be prescribed by law. No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasance shall

be void. This amendment shall become effective upon its adoption.

Vernon's Ann.Texas Const. Art. 16 § 50. Furthermore, the Texas Property Code § 41.001(a) provides that "[a] homestead and one or more lots used for a place of burial of the dead are exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property."

 Texas law is clear that homestead laws should be liberally construed in order to effectuate their beneficent purpose. *In re Bradley* at 507 *(citations omitted)*. In *In re Moody*, 77 B.R. 566, 576 (S.D.Tex.1987), the court concluded that even though the debtor's machinations may have been prompted by the desire to remove his assets from execution by creditors, the trustee still could not enforce an equitable lien on the claimed homestead of the debtor. The Osborns have met the burden of proof to establish that the Texas property was their homestead. Both Debtors testified that the Texas property was really their homestead and that they believed they had to list the Oklahoma address on the bankruptcy schedules since they were filing a business bankruptcy. Therefore, the burden shifts to the Bank to disprove that the Texas property was the Debtors' homestead.

The Bank attempted to disprove that the Texas property was the Debtors' homestead by showing that the address listed on the Debtors' bankruptcy reflected an address in Bokchito, Oklahoma. The Debtors' explanation was that they believed they had to list the address of their farm since they were filing a "business" bankruptcy. However, the creditor pointed out that there was no reference on any documents that reflected this was a business address. The creditor further pointed out that the Debtors had claimed a homestead exemption in Oklahoma from 1970 until 1987, when it was finally rejected by Bryan County officials.

 Most importantly, the creditor pointed out that O.J. Osborn had testified in the initial § 341 meeting that he resided in Oklahoma for 180 days preceding the filing of the bankruptcy and that he intended for his Oklahoma property to be exempt. The Tenth Circuit opinion discussed the possibili-

ty of the Osborns being estopped from claiming the Texas property as exempt because of their representations that they were claiming the Oklahoma property as their homestead. As the Tenth Circuit noted, the rule in Texas is that estoppel must be based on the acts of both the husband and the wife. *Osborn* at 1209 (*citing Martin v. Astin,* 295 S.W. 584 (Tex.Comm.App.1927)). For that reason, the Tenth Circuit held "that the rejection of the homestead claim of the Osborns respecting the Texas property was in error." *Id.*

This Court, after hearing lengthy testimony of both Mr. and Mrs. Osborn, concludes that much of their testimony is inconsistent with the documentary evidence. This Court would not be so inclined to fashion a remedy for the Osborns except for its unbending adherence to the spirit and mandate of the Tenth Circuit which directs this Court to give the Osborns something.

■■■■ After weighing the Debtors' right to a "fresh start" and the creditor's right to proceeds, this Court does hereby find that the Osborns' right to the Dallas home outweighs the Bank's right to full recovery of the proceeds obtained from the sale of the Debtors' homestead. Evidence presented to this Court on remand did not provide the Court with any factual basis to estop Mrs. Osborn from asserting that the Dallas property was her homestead. Thus, the Debtors cannot be estopped from asserting the Texas property was their homestead.

■■■■ Durant Bank & Trust received $16,649.80 from the proceeds of the sale of the Debtors' property in Texas, after payment of fees and expenses. However, Durant Bank & Trust should be entitled to an offset of the amount consumed by the Debtors of $11,071.30, as a result of the earlier cash collateral order which was never appealed.

■■■■ Evidence has been considered as to the value of the Texas property. The Court does not find credible Mrs. Osborn's testimony that the home was re-carpeted shortly before the eviction. This does not appear logical when considering the Osborns were not paying rent; were looking at certain eviction for nonpayment of rent; and also realizing that the ad valorem taxes were in arrears almost three years.

■■■■ This Court finds that the fair market value price was realized at the auction when $27,000 was the highest bid. The auction was advertised by the auctioneer. Further, the auctioneer held inspections on January 6, 1991 and January 13, 1991 prior to the sale at the house on January 15, 1991. The auctioneer placed an advertisement in the Dallas Morning News, the Dallas Morning Times and directly mailed approximately 1,500—2,000 advertisements to potential purchasers. At the auction itself, which was held on the premises, over 50 people attended and there were approximately 22 registered bidders. The U.S. Supreme Court has deemed a "reasonably equivalent value" for foreclosed property was "the price in fact received at the foreclosure sale, so long as all the requirements of the state's foreclosure law have been complied with." *BFP v. Resolution Trust Corp.,* —— U.S. ——, ——, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994). In the instant case, the auctioneer gave notice of the sale. A brochure was printed describing the house. As a result, this Court finds that the sales price received at the Trustee's sale, as a foreclosure sale, was the fair market value of the house.

■■■■ In the Court's previous Order of August 17, 1990, the Trustee was authorized to pay, without further Order of the Court, the auctioneer a 5 percent commission plus reimbursement of out-of-pocket expenses. As a result, the auctioneer was paid $2,859.72. Taxes due to the Dallas City and School District for 1988, 1989 and 1990 in the amount of $3,080.23 and Dallas State and County taxes for 1988, 1989 and 1990 in the amount of $712.53, which were paid at the time of the sale, must also be deducted, in the total amount of $3,792.76. (See Asset Liquidation Report filed February 19, 1991). Reducing the value of the house by the expenses paid to the auctioneer, taxes due and the amount allowed by the Bankruptcy Court's cash collateral order, the Debtors should be allowed to recover $9,276.22 from Durant Bank & Trust. The Debtors further request an award of attorney fees. However, absent statutory authorization or contrac-

tual obligation, a party is not entitled to attorney fees because he prevailed in the litigation. *See, e.g., In re Hemingway Transport,* 993 F.2d 915 (1st Cir.1993) (*citing Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976)); *In re Masnorth Corp.,* 36 B.R. 335, 355 (Bankr. N.D.Ga.1984). This Court is not aware of any statutory or contractual obligation which would entitle the Osborns to attorney fees. Therefore, the Court denies the Debtors' request for attorney fees.

█ The Court does not find that the Debtors should recover the auctioneer fee, rent and/or storage expense because the Debtors had the option per Court Order to pay rent to the Bank, which they elected not to pay. Furthermore, the Debtors elected not to appeal any of the other prior Orders of the Bankruptcy Court pertaining to the sale.

IT IS THEREFORE ORDERED that the Debtors are allowed to amend their Schedules and to claim the Texas property as exempt. The Osborns are entitled to recover a judgment of $9,276.22, inclusive of interest, against Durant Bank & Trust.