**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IN RE:  BCD CORPORATION,
f/k/a Provo Aquatic Park, Inc.,

Debtor,

------------------------------------------
GOLFLAND ENTERTAINMENT
CENTERS, INC.,

Appellant,

v.

No. 95-4171

PEAK INVESTMENT, INC.;  BCD
CORPORATION and ROBERT E.
WILCOX, the Commissioner of Insurance
of the State of Utah and liquidator of
Southern American Insurance Company,

Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 94-CV-829)**

Jeffrey L. Shields (Zachary T. Shields, with him on the brief) of Callister Nebeker &
McCullough, Salt Lake City, Utah, for Appellant.

Craig Carlile of Ray Quinney & Nebkeker, Provo, Utah;  and Duane H. Gillman (Leslie J.
Randolph, with him on the brief) of McDowell & Gillman, Salt Lake City, Utah, for
Appellee.

Before **EBEL, HOLLOWAY,** and **MURPHY**, Circuit Judges.

——————————————————

**HOLLOWAY,** Circuit Judge.

——————————————————

Appellant Golfland Entertainment Centers, Inc. (Golfland) appeals from the district court's order affirming the bankruptcy court's vacating of a confirmed sale. We have jurisdiction over the district court's order pursuant to 28 U.S.C. § 1291 and we affirm.

**I**

The facts of this appeal, which are essentially undisputed except as noted below, are as follows:

The subjects of this appeal are a water park, a storage shed, and a barn property, all located in Provo, Utah. Appellee BCD Corporation (BCD) owned the water park, and the other two properties were owned by third parties who are not parties to this appeal. See I App. at 5, 49-50. When BCD entered into Chapter 11 bankruptcy proceedings, it sought to liquidate the water park, and the storage shed and barn property came under the jurisdiction of the bankruptcy court because all three had to be sold together to satisfy Utah zoning ordinances. Id. at 50-51. Between October and December 1993, B & B Properties Co. (B & B) and BCD made a number of offers and counteroffers regarding the three properties, culminating in an agreement on December 7, 1993. Id. at 5-34. The agreement noted that the bankruptcy court could approve another offer instead. Id. at 27.

BCD then sought higher and better offers than B & B's, with such offers to be filed

2

at least two days before a hearing on BCD's motion to confirm the sale to B & B. Id. at 2-3. Golfland, Peak Investments, and University Properties, Inc. (UPI) submitted written offers. II App. at 574-75, 587. On February 22, 1994, BCD solicited additional offers by way of an oral auction. I App. at 390. At the oral auction, the bidders tracked the terms of UPI's offer, which waived the conditions of closing contained in paragraph 5 of the original B & B offer.[1] Id. at 407-08. The bidding continued between Golfland and Peak Investments, with Golfland submitting the highest bid at $2.61 million. II App. at 467. Peak submitted a back-up bid of $2.2 million. I App. at 373-74. The bankruptcy court confirmed the sale to Golfland orally on February 23, 1994, id. at 66, and by written order on March 28, 1994. Id. at 85-87.

However, on April 7, 1994, Peak filed a motion to enforce sale to the alternative bidder, claiming, inter alia, that Golfland had changed the terms of the bid. Id. at 92. At issue was whether Golfland was demanding to be reimbursed for any environmental clean-up costs that might be incurred. Id. at 96. Golfland contended that no modification of terms had occurred. Instead, it argued that it had not waived the environmental warranties, only the conditions to closing. II App. at 685-86.

---

[1]Paragraph 5 of the B & B offer was titled, "Conditions to Closing," and required, inter alia, the completion of a land survey, an engineering report, and an environmental assessment, plus the obtaining of governmental approval, the bankruptcy court's approval, and utility service assurances. I App. at 7-11.

In response to this dispute, the bankruptcy court received evidence and testimony in a four-day hearing. The court's significant oral findings which followed at the June 6, 1994, hearing were that:

> All of the written offers track the B&B offer except that of University, which waived nearly all of the conditions.
>
> At the auction, University agreed that that included most of paragraph 5 of the B&B offer. Everyone at the offer believed that the risk of environmental problems on the property being purchased was thereby shifted to the buyer.
>
> . . . .
>
> Thereafter, a dispute arose between the sellers and Golfland about the terms of the sale. The sellers agreed to make the following concessions to Golfland. Among others they were that the sellers would bear up to $200,000 of the costs of environmental remediation and one half of a $33,000 bond, which had been filed to meet the requirements of the City of Provo.
>
> . . . .
>
> Mr. Monson, the attorney documenting the transaction for the sellers, wanted to attach to the order a document showing what the offer was, but because the parties couldn't agree just referred to the offer made at the sale.
>
> . . . .
>
> In this case the terms were not disclosed to the court. The terms that the parties thought they were bargaining on and bidding on turn out not to be the terms of the sale which is ultimately proposed to the court. The court didn't have the opportunity to give that vital protection because the court didn't have the information that it needed. The parties didn't have the information they needed to make appropriate objections and arguments. That part of the notice and hearing requirement for the sale of property simply was not met.

II App. at 789-91 (emphasis added).

4

The bankruptcy court's written order vacated the confirmed sale to Golfland, stating in part that

> 1. The sale to Golfland is not a sale which has been approved by the Court, and that sale is, therefore, not authorized.
>
> 2. The major changes in the terms of the sale did not give the bidders a fair opportunity to bid at the sale and the notice and further proceedings did not give the Court an opportunity to make a reasoned decision about whether or not to approve the sale and other parties an opportunity to properly object.
>
> 3. The Order Approving Sale of Property Free and Clear of Liens, Interests and Encumbrances dated March 31, 1994, is hereby set aside.
>
> 4. The Debtor is ordered not to proceed with a final sale of the water park property without further order of the Court.
>
> DATED this 6 day of July, 1994.

II App. at 807.

The district court affirmed the bankruptcy court's decision, concluding that the bankruptcy court's finding of a mistake in the sale was supported by the record and was legally sufficient to set aside the sale. Id. at 1015-16. This appeal followed.

After the filing of the notice of this appeal, but before oral argument to this court occurred, BCD sold the water park and adjacent properties to BTS with a high bid of $3.6 million in a second sale. See Aple. Trustee's Reply to Appellant's Memorandum of Points and Authorities and Authorities in Opposition to Appellee's Motion for Summary

5

Disposition, Ex. J, at 2; id. at Ex. K, at 2.[2] Golfland did not seek a stay of this second sale

to BTS; Golfland argues that its "decision not to seek a stay of the sale to BTS was based,

in part, upon the representations of the Debtor [BCD] and the Bankruptcy Court that

Golfland's interest would attach to such proceeds." See Aplt. Memorandum of Points and

Authorities in Opposition to Appellee's Motion for Summary Disposition, at 10. Arguing

that the property which is the subject of this appeal has been sold to a good faith purchaser,

BCD has moved to dismiss as moot this appeal from the order vacating the first sale to

Golfland, which led to the second sale to BTS.

## II

We address the issue of mootness as a threshold question because in the absence of

a live case or controversy, we have no subject-matter jurisdiction over an appeal. See Beattie

v. United States, 949 F.2d 1092, 1093 (10th Cir. 1991).

BCD argues that this appeal should be dismissed as moot because the subject of the

bankruptcy appeal -- the water park -- has been sold to a good faith purchaser and hence there

would be no remedy available even if Golfland were to prevail on the merits of its appeal.

See 11 U.S.C. § 363(m) (stating that the validity of a good faith purchase will not be

disturbed unless the sale is stayed pending appeal). In Tompkins v. Frey, 706 F.2d 301, 304-

05 (10th Cir. 1983), we held that where a party appealing from an order authorizing the sale

---

[2]On August 2, 1995, Duane H. Gillman was appointed as the interim trustee. See Aple. Memorandum of Points and Authorities in Support of Motion for Summary Disposition Because of Mootness, at Ex. D. The Trustee is defending this appeal.

of a debtor's property fails to obtain a stay of the order and the property is subsequently sold to a "good faith purchaser," the property is removed from the jurisdiction of the courts and the appeal is mooted.

However, in Osborn v. Durant Bank & Trust Co., 24 F.3d 1199, 1203-04, 1210 (10th Cir. 1994), we held that because it was not impossible there to grant some measure of effective relief (in that case under Texas constructive trust principles), the appeal was not moot, although the debtors had not obtained a stay of the sale of their home. We noted that § 363(m) had removed only the possibility of remedies that would affect the validity of a sale to a good faith purchaser. Id. at 1203-04. Moreover, we cited the applicable Texas constructive trust principles and their flexibility and breadth. Id. And we note that on remand a money judgment of some $9,276 was recovered by the debtors due to the exercise of equitable powers of the bankruptcy court, In re Osborn, 176 B.R. 941, 949 (1994), aff'd, 83 F.3d 433 (10th Cir. 1996) (table), after determination of the facts on remand. That recovery was upheld by the district court and this court on appeal in unpublished opinions. Osborn is thus an exception to the general rule of Tompkins and is available here because, as a practicable matter, equitable relief might be granted, as noted below.

In a similar case the Seventh Circuit held that an appeal would not be dismissed as moot where there was a possibility of recovery, to which the appellant might be entitled, from proceeds of a sale of property in a bankruptcy case. See Matter of Lloyd, 37 F.3d 271 (7th Cir. 1994). A sale of land was made without a stay being sought and it was held that

therefore the debtor's claim for return of the land was moot. Nevertheless there were proceeds from the sale and the debtor's assertion that she should recover compensation from those undistributed funds for the value of land improperly sold in addition to the land severed for the debtor's homestead prevented dismissal of the appeal as moot. Id. at 273. The Seventh Circuit panel had been advised at oral argument that the proceeds from the sale of land remaining after severance of three acres for the homestead were being held pending the outcome of the Seventh Circuit's case. Id. at 273. This is similar to our circumstances in that we are advised of a Money Market Account balance of the Trustee of some $3,941,466 at the Depository Chemical Bank. Appellant's Memorandum, Ex. D(4), Form 2, p. 3. Because these substantial proceeds are thus segregated, the practical possibility of equitable relief is apparent.

Utah law, similar to the Texas law in Osborn, provides for equitable remedies under the principles of constructive trusts. See Parks v. Zions First National Bank, 673 P.2d 590, 596-600 (Utah 1983). Thus there is the possibility of relief below for Golfland if it should obtain a favorable ruling on appeal, such as a holding that the bankruptcy court erred in vacating approval of the sale.[3] This is true, given that here the sale proceeds have not been dispersed, cf. In re Whatley, 169 B.R. 698, 702 (D. Colo. 1994) (distinguishing Osborn on

---

[3]Were Golfland to succeed on the merits of this appeal and be entitled to equitable relief, an appropriate remedy might be a damages award corresponding to the difference between the sale price of the property and the price Golfland had bid at the oral auction. See, e.g., In re Osborn, 176 B.R. at 949 (awarding debtors $9,276 after deducting offsetting costs and fees from sale proceeds).

8

the ground that the proceeds had been dispersed and the court could not discern any possible way to fashion any effective relief even if the appellant prevailed), aff'd, 54 F.3d 788 (10th Cir. 1995) (table), but instead are being held in a money market account. See Aplt.'s Memorandum of Points and Authorities in Opposition to Appellee's Motion for Summary Disposition, Ex. D, at 2 (Supplement to Trustee's Report Regarding Auction of Real & Personal Property of the Estate).

In this case, at oral argument Golfland's counsel argued unambiguously that Golfland had asserted below an interest in the sale proceeds, while BCD's counsel unambiguously denied this. We need not resolve this dispute, however, because we feel that whether Golfland actually asserted an interest in the proceeds below is not critical to our determination whether the appeal has been mooted. As discussed earlier, we believe that this case falls within the exception to the Tompkins rule articulated in Osborn. Even if Golfland did not assert an interest in the sale proceeds below, we feel that in these circumstances we should consider the question of the practical possibility of Golfland's obtaining equitable relief in connection with our mootness determination. Although we generally will not consider issues on appeal that were not presented to the district court, this rule is not inflexible. See Anixter v. Home-Stake Product Co., 77 F.3d 1215, 1228 (10th Cir. 1996). Rather, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Id. (quoting Singleton v. Wulff, 428 U.S. 106, 121 (1976)).

9

On the mootness question before us, we believe that it is proper for us to consider Golfland's potential recovery from the sale proceeds. First, the evidence and legal arguments relating to the claim for proceeds are the exact same as matters presented below relating to Golfland's argument that the initial confirmed sale should not have been vacated; thus, there is no possibility of unfair surprise or waste of judicial resources involved here. See Anixter, 77 F.3d at 1228 (noting these concerns). Moreover, as noted above, we have been advised of a balance in the Money Market Account of the Trustee of some $3,941,461 at the Chemical Bank, which is relevant to the practical possibility of an award of equitable relief.

Therefore, we conclude that this appeal is not moot and we deny BCD's motion to dismiss the appeal as moot.

**III**

We now turn to the merits of the appeal. We accept the factual findings of the bankruptcy court in the absence of clear error. Its legal conclusions are reviewed by the district court and by us de novo. In re Herd, 840 F.2d 757, 759 (10th Cir. 1988). The bankruptcy court's decision to vacate the confirmed sale of the water park was necessarily entered under Fed. R. Civ. P. 60(b) (applicable to adversarial proceedings in the bankruptcy court pursuant to Fed. R. Bankr. 9024), a decision that we usually review for an abuse of discretion. See Stubblefield v. Windsor Capital Group, 74 F.3d 990, 994 (10th Cir. 1996); but see Orner v. Shalala, 30 F.3d 1307, 1309-10 (10th Cir. 1994) (discussing exceptions to this rule).

10

## A

Initially, we note that Golfland argues under theories of waiver, lack of standing, and estoppel, that BCD (and by implication the Trustee) should not be allowed to defend this appeal. Golfland contends that in proceedings before the bankruptcy court, BCD joined it in opposing Peak's motion to vacate the confirmed sale, but that in proceedings before the district court and this court, BCD changed its legal position so that it (BCD) has now taken a position in opposition to Golfland. Golfland contends that this switch in legal position has prejudiced it by leading it to come to this appeal with an incomplete record. Relying on Paul v. Monts, 906 F.2d 1468, 1473 (10th Cir. 1990), Golfland also argues that BCD lacks standing to defend an appeal where it was also the losing party below and that BCD should be estopped from taking a legal position opposite from one it adopted earlier.

The record does indicate that BCD supported Golfland's position before the bankruptcy court, and in fact, BCD filed a brief in opposition to Peak's motion to enforce the sale to the alternative bidder. See I App. at 114. BCD also joined Golfland's opposition to Peak's motion. Id. at 193. We agree with Golfland that the Trustee for BCD is now attacking arguments that BCD presented earlier to the bankruptcy court.

We are doubtful that Paul is on point. Paul dealt with whether a party should be estopped from taking inconsistent positions regarding a transaction, such as whether an enforceable contract existed. See id. at 1473. We believe that Golfland "in effect has invoked the doctrine of judicial estoppel." Judicial estoppel bars a party from adopting

11

"inconsistent positions in the same or related litigation."  United States v. 49.01 Acres of Land, More or Less, 802 F.2d 387, 390 (10th Cir. 1986).  The Tenth Circuit, however, has rejected the doctrine of judicial estoppel as being inconsistent with the spirit of the Federal Rules of Civil Procedure, id. (citing Parkinson v. California, 233 F.2d 432, 438 (10th Cir. 1956)), and in any event, judicial estoppel would only apply if the party adopting the inconsistent positions had actually succeeded in the earlier litigation.  Id.  Since BCD did not succeed in its original position (opposing the vacating of the sale to Golfland) in the bankruptcy court, it and the Trustee cannot be judicially estopped from taking a contrary position in this appeal.[4]

Moreover, even if Paul were applicable in this case, estoppel would not be warranted.[5] In Paul we held that to maintain an estoppel defense, a party "must also demonstrate a detrimental change in its position as a result of reasonable reliance on that conduct."  906 F.2d at 1474.  Because the defendant in that case had failed to identify any detrimental change in position, we declined to apply estoppel there.

Here, Golfland has not identified any specific material change in its position based on reasonable reliance on BCD's earlier position, and we have not found any based on our

_____

[4]See also Crenshaw v. Quarles Drilling Corp., 798 F.2d 1345, 1347 (10th Cir. 1986) (allowing the defendant to argue an inconsistent position on appeal where the plaintiff was not "being asked to address a question that was not considered at trial").

[5]We believe that Paul also may be distinguishable on the ground that jurisdiction there was premised on diversity of citizenship, and the estoppel discussed therein was supported by citation to Kansas law, and not federal law, as in 49.01 Acres, 802 F.2d at 390.

12

review of the record. The record indicates that Golfland's counsel, Mr. Shields, took part in cross-examining witnesses before the bankruptcy court. See id. at 356 (cross-examination of Jason Buck); id. at 434 (cross-examination of Richard Knapp); II App. at 480 (cross-examination of John Kenney); id. at 555 (declining to cross-examine Lennard Stillman); id. at 678 (cross-examination of Douglas Monson). Furthermore, Mr. Shields examined additional witnesses to adduce more evidence in support of Golfland's position. Id. at 718 (cross-examination of Ty Mattingly); id. at 732 (direct examination of Steven Tyler); id. at 779 (direct examination of John Kenney). Mr. Shields examined every single witness that BCD's counsel questioned, plus two additional ones and a recall of a third witness. Thus, there was no lack of vigorous action by Golfland in building the record to uphold the first sale to Golfland.[6] Nor has Golfland suggested or shown that BCD somehow obstructed or prevented it from developing any aspect of the record that would have a material impact on this appeal. Considering the lack of such a showing, and the extensive record -- much of which consisted of Mr. Shield's questioning -- we are at a loss to understand how Golfland has been prejudiced.

---

[6]Moreover, Mr. Shields' questioning was aimed at eliciting evidence to support the contention that the confirmed sale to Golfland should be upheld. For example, Mr. Shields called Steven E. Tyler as a witness in an attempt to show that Golfland had not altered the terms of the first sale. See, e.g., II App. at 759-60. Similarly, Mr. Shields' cross-examination of Ty Mattingly, co-owner of Peak, was intended to show that Peak, in fact, had not waived title insurance -- a contention that if true would support Golfland's assertion that it had not waived environmental warranties. See id. at 718-19.

13

We are also satisfied that the Trustee for BCD has a sufficient stake in this appeal to have standing to take the position he has. Our conclusion that this appeal is not moot suggests that, were Golfland to prevail on the merits, it might be entitled to an award of damages under a constructive trust theory. Since the Trustee sold the water park to a good faith purchaser, it follows that the bankruptcy estate would have to pay any damages award out of the proceeds of the sale. We believe that this potential damage award indicates that the Trustee is entitled to defend this appeal. "It is a Chapter 7 trustee's obligation to contest claims against the estate when defenses to such claims are available." In re Mazzocone, 183 B.R. 402, 415 n.4 (Bankr. E.D. Pa. 1995), aff'd, 200 B.R. 568 (E.D. Pa. 1996); see also In re Martin, 91 F.3d 389, 394 (3d Cir. 1996) ("[A] trustee has a fiduciary relationship with all creditors of the estate . . . . She has the duty to maximize the value of the estate") (emphasis in original); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3974.2, at 493 & n.4 (1996) (citing Massachusetts Mutual Life Ins. Co. v. Ludwig, 426 U.S. 479, 480 (1980); Helvering v. Gowran, 302 U.S. 238, 246 (1937)) ("The appellee is also free to present arguments in support of the judgment below by any reasoning from facts disclosed in the record, even though that reasoning was rejected by the court below or was not even advanced below by the appellee.").

**B**

Golfland's central argument on the merits of its instant appeal is that both the bankruptcy court and the district court applied the incorrect standard in evaluating whether

14

to set aside the confirmed sale of the water park to Golfland. Relying on <u>Smith v. Juhan</u>, 311 F.2d 670, 672 (10th Cir. 1962), <u>inter alia</u>, Golfland contends that once a proposed judicial sale has been confirmed, it can be set aside only if there is a fundamental defect that "shocks the conscience" and that this strict standard was not met here.

We agree that the bankruptcy court is to apply different standards when it considers whether to confirm a proposed sale as opposed to when it decides whether to vacate a previously confirmed sale. <u>See</u> <u>Juhan</u>, 311 F.2d at 671-72 (noting a clear distinction between the two situations and that a stricter standard applies after confirmation to warrant a court in avoiding confirmation of a sale). However, we believe that Golfland misreads <u>Juhan</u> with regard to the controlling reach of the "shocks the conscience" standard. In <u>Juhan</u>, we held that:

> In this jurisdiction, it is well settled that a judicial sale regularly made with notice and in the manner prescribed by law will not be denied confirmation or be set aside for mere inadequacy in price unless the price is so grossly inadequate as to shock the conscience of the court and is coupled with slight additional circumstances indicating unfairness such as chilled bidding.

<u>Id.</u> at 672. We noted further that:

> . . . the rule is settled, and it seems to be universally approved, that after confirmation of a judicial sale neither inadequacy of price, nor offers of better prices, nor anything but fraud, accident, mistake, or some other cause for which equity would avoid a like sale between private parties, will warrant a court in avoiding the confirmation of the sale or in opening the latter and receiving subsequent bids.

<u>Id.</u> at 672 (quoting <u>Morrison v. Burnette</u>, 154 Fed. 617, 624 (8th Cir. 1907), <u>appeal dismissed</u>, <u>Laurel Oil & Gas Co. v. Morrison</u>, 212 U.S. 291, 292 (1909).

15

In <u>Juhan</u> we upheld the Referee's decision not to set aside the original confirmed sale, even though the appellant's bid topped the confirmed sale price of $7,500 by $1,000 because:

> Here, the sale by the Trustee for $7,500.00 was made in the manner prescribed by law and the facts fail to show that the price obtained for the property at such sale is so grossly inadequate as to shock the conscience of the court. Certainly, the facts as disclosed by the record fall far short of showing fraud, accident, mistake or any other cause for which equity would avoid a like sale between private parties.

<u>Juhan</u>, 311 F.2d at 673. Thus <u>Juhan</u> does not mandate a conscience-shocking showing for all decisions to set aside confirmed sales; <u>Juhan</u> instead imposes a high requirement for challenges based on mere inadequate price. <u>Id.</u> at 672. However, <u>Juhan</u> also unequivocally recognizes fraud, accident, mistake, or any other cause for which equity would avoid a like sale between private parties, without demanding that such conditions rise to the level of shocking the conscience of the court.

We find further support for our conclusion on the standard of proof to set aside a confirmed sale in <u>Mason v. Ashback</u>, 383 F.2d 779, 780 (10th Cir. 1967). There we set aside a judicially confirmed sale on the ground that there was no notice of the sale given to creditors. Although we acknowledged the rule that mere inadequacy of price alone requires showing that the price shocks the conscience of the chancellor to set aside a judicial sale, we did not require such a showing where there was a fundamental defect in the bidding process due to lack of notice to the creditors of the sale. <u>Id.</u> at 780.

16

We believe that Webster v. Barnes Banking Co., 113 F.2d 1003 (10th Cir. 1940), also supports the conclusion we reach on the standard required. Webster stated the basic bankruptcy principles clearly long ago:

> A court of equity may set aside an order of sale either before or after confirmation when it appears that the same was entered through mistake, inadvertence, or improvidence.
>
> While a judicial sale will not be set aside on the ground of inadequacy of price alone, unless the inadequacy is so great as to shock the conscience of the chancellor, inadequacy of price, accompanied with other circumstances having a tendency to cause such inadequacy, or indicating any apparent unfairness or impropriety, will justify setting aside the sale. Such additional circumstances may be slight and insufficient in themselves to justify vacating the sale.

113 F.2d at 1005 (footnotes and citations omitted). This reading of Webster has been followed by our more recent precedent. See Mason, 383 F.2d at 780 (quoting Webster, 113 F.2d at 1005); see also In re WPRV-TV, 983 F.2d 336, 340-41 (1st Cir. 1993); Matter of Chung King, 753 F.2d 547, 549-50 (7th Cir. 1985).

Under this standard we are convinced that the bankruptcy court did not abuse its discretion in setting aside the original sale when it concluded that the confirmation had been granted through a mistake as to the terms of the sale. The bankruptcy court found that initially everyone present at the bidding "believed that the risk of environmental problems on the property being purchased was thereby shifted to the buyer." II App. at 789. However, the sellers and Golfland disagreed as to the terms of the sale, in particular whether Golfland had assumed the risk of environmental remediation. Id. at 790. The parties then agreed that

17

the sellers would assume the risk of the first $200,000 in environmental liability and half of a $33,000 bond that had been filed to meet municipal requirements.  Id.  As a result, the bankruptcy court found that "[t]he terms that the parties thought they were bargaining and bidding on turn out not to be the terms of the sale which is ultimately proposed to the court." Id. at 791.[7]

Although Golfland contends that the bankruptcy court erred in finding that there had been a waiver of the environmental warranties, see Aplt. Brief at 38, we do not see any such finding in the bankruptcy court's ruling.  The court found that "Mr. Monson, the attorney documenting the transaction for the sellers, wanted to attach to the order a document showing what the offer was, but because the parties couldn't agree just referred to the offer made at the sale."  II App. at 790 (emphasis added).  Although the court's findings could have been stated more clearly, we read the court as having found that Golfland and BCD as the seller had never actually agreed upon the terms of the sale, specifically with regard to the environmental warranty provisions.  See II App. 789-91.

_____

[7]We recognize an apparent inconsistency in the bankruptcy court's oral findings regarding whether all of the bidders understood that the environmental warranties had been waived or whether the parties could not agree on the terms of the sale.  Nevertheless, it is clear that, to reach its stated holding of vacating the confirmed sale, the bankruptcy court must have relied on the finding that the parties could not agree on the terms of the sale.  As we discuss further below, that finding is not clearly erroneous.

18

There is ample evidence in the record to support this finding. Douglas Monson, an attorney representing the Utah State Insurance Commissioner in conjunction with the sale of the water park, testified that the terms of the offer were in question:

> We agreed that it would probably be best to memorialize what the exact Golfland offer was because it had been an oral offer due to the nature of the auction. So we tried to memorialize with Golfland what the nature of the offer was so we could attach it to the offer -- to the order as an exhibit to the order so it would become clear on the public record what the nature of the offer was.
>
> We never -- at that time we didn't reach agreement with Golfland as to what their offer was based on the acceptances that I sent over. We eventually decided to abandon that approach and just say that the -- in the order that the offer that was approved by the court was the offer made at the auction as approved by the court and not attach a copy of that.

II App. at 669.

Similarly, Golfland Senior Vice President John Kenney's testimony demonstrates confusion as to the terms of the sale. In reference to his deposition testimony that he had intended to waive the environmental warranties, Kenney testified at the bankruptcy hearing that "I think my answer was partial at best and misleading at worst," see II App. at 463. With regard to whether the water park sellers understood Golfland to have waived the warranties, Kenney testified that "My memory has it now that in that meeting they didn't take a strong position." See id. at 471.[8]

---

[8]The confusion regarding the terms of the sale probably began with Richard Knapp, the bidder who first waived the environmental warranties. Mr. Monson testified, "We asked Mr. Knapp what was meant in his written offer by -- he stated that he was waiving all contingency to closing but that his purchase of the property was otherwise subject to all of the terms and conditions of the B & B offer which he had adopted. We asked Mr. Knapp

Considering that the parties could not memorialize the terms of the sale due to disagreement, and that Golfland's own representative seemed unsure as to what he had agreed to, it is little wonder that the bankruptcy court stated, "And they submitted, accordingly, an order that was vague enough to cover up the fact that there was no deal at the time they asked the Court to approve it." II App. at 729.

We are convinced, based on all the evidence, that the bankruptcy court's factual finding that there never were agreed-upon terms for the sale of the water park was not clearly erroneous. Furthermore, the bankruptcy court's decision to set aside the confirmed sale on the ground that it had been entered under a mistake as to the terms of the agreement was not an abuse of discretion. See Mason, 383 F.2d at 780 (justifying avoidance of a sale when entered, inter alia, through mistake, inadvertence, or improvidence).

## C

Golfland's other challenges to the decisions of the bankruptcy court and the district court are that the factual finding that Golfland waived the environmental warranties was clearly erroneous and that, even assuming that Golfland had changed the terms of the sale, the proper remedy would have been to allow the sale to go forward under the original terms presented to the bankruptcy court.

We have considered these arguments and are not persuaded that it was error or an abuse of discretion to set aside the sale. The argument regarding whether Golfland had

what he meant by that because it was confusing to us." II App. at 589-90.

20

waived the environmental warranties is irrelevant, given the finding, which we uphold, that there had not been an agreement as to the terms of the sale. Similarly the bankruptcy court could not enforce the original terms of the sale because there had been no agreement as to the original terms, as demonstrated by the testimony of Mr. Monson.

Accordingly the motion to dismiss the appeal as moot is **DENIED** and the district court's order affirming the vacation by the bankruptcy court of the confirmed sale is **AFFIRMED.**