In re MAGNOLIA GAS
COMPANY, L.L.C.

and

Magnolia Gas Transmission
Company, L.L.C.

and

MKP Production Company,
L.L.C. Debtors,

Energy Income Fund, L.P., Plaintiff,

v.

Compression Solutions, Co.,
L.L.C., Defendant.

Bankruptcy Nos. 98–22060–BH, 98–22062–BH, 98–22061–BH.

Adversary No. 99–1342–WV.

United States Bankruptcy Court,
W.D. Oklahoma.

Nov. 21, 2000.

Brian L. Peterson, Elias, Books, Brown, Peterson & Massad, Clifford A. Wright, Clifford A. Wright, P.C., Oklahoma City, OK, for Plaintiff.

Christopher J. Redmond, Husch & Eppenberger, LLC, Kansas City, MO, Timothy D. Kline, Kline & Kline, Oklahoma City, OK, for Defendant.

### *MEMORANDUM OPINION*

THOMAS M. WEAVER, Bankruptcy Judge.

This matter came on for trial on the plaintiff Energy Income Fund, L.P.'s ("EIF") adversary complaint, defendant Compression Solutions Co., L.L.C.'s ("CSC") answer and counterclaim and EIF's answer to the counterclaim. At the

conclusion of the trial, due to the large number of issues and voluminous exhibits, the court directed the parties to submit post-trial proposed findings of fact and conclusions of law focusing on those issues the parties considered important to their respective case. These submissions were filed, and oral argument thereon was conducted. After having heard the arguments of counsel, having reviewed the relevant exhibits and the transcripts of the trial and oral argument, and having considered the applicable law, the court enters the following memorandum opinion which will constitute its findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52(a), which is made applicable to this proceeding by way of FED. R. BANKR. P. 7052.

### Factual Findings

1. On December 9, 1998 (the "Petition Date"), the debtors, MKP Production Company, L.L.C. ("MKP"), Magnolia Gas Company, L.L.C. ("Magnolia"), and Magnolia Gas Transmission Co., L.L.C. ("MGTC")(collectively "Debtors," unless otherwise specifically referenced), filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code ("Bankruptcy Code").[1] Pursuant to § 1107 and § 1108, Debtors were authorized to operate their businesses and manage their properties as debtors-in-possession until August 12, 1999. The cases of the three Debtors are being jointly administered; however, there has been no substantive consolidation of the cases.

2. As of the Petition Date, both Magnolia and MKP were Oklahoma limited liability companies comprised of the same members. Okland Oil Company ("Okland"), owned 87.5% of each company. Okland was also the managing member of both companies at all times from their formation until August 12, 1999.

3. CSC is an Oklahoma limited liability company comprised of the same members, and in the same proportions, as Magnolia and MKP. Okland was the managing member of CSC.

4. Debtors were involved in the production, treatment, purchase, processing, transportation and sale of natural gas. MKP and Magnolia were in the business of producing and operating a natural gas refinery in Arkansas (the "Gas Plant"). Debtors owned various assets used in conjunction with the Arkansas operations, including a mineral interest in the McKamie–Patton Unit ("MKPU"), a sour gas field. Sour gas must be processed before it can be sold. The Gas Plant processed the sour gas from the MKPU as well as gas produced by third-parties from other gas fields in the area. The Gas Plant "sweetened" raw gas by removing the acid gases ($H_2O$ and $CO_2$), and the acid gas stream was then processed in the Gas Plant's sulfur recovery unit for recovery and sale of pure sulfur.

5. Debtors owned various pipelines and gas gathering systems which serviced other natural gas fields, including the Whiting Field, the Dorcheat Field and the Macedonia Field. The Dorcheat and Macedonia Fields produced "sweet gas," which did not require processing before being sold.

6. In 1996, a producing gas field and sweetening plant owned by MKP Operating Company and a gas gathering/pipeline system owned by BCF, Ltd., was identified by those who would form Magnolia and MKP as a project for acquisition and for installation of a cryogenics liquid recovery plant ("Cyro–Plant") in southwest Arkansas (the "Arkansas Project"). In September of 1996, Magnolia was formed to acquire the pipelines and gas company assets, and MKP was formed to purchase the producing field and sweetening plant. The business plan for the Arkansas Project anticipated that Magnolia would purchase and transport third-party sweet and sour gas in the area to the MKP Plant, where MKP would process the sour gas for a fee. Magnolia would then process the sweet

---

1. Hereinafter, all references to statutory provisions are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 2000), unless otherwise specified.

gas in the Cryo–Plant for liquids and Magnolia and MKP would sell the tailgate gas to third parties.

7. EIF provided financing to Magnolia and MKP for the Arkansas Project. On September 27, 1996, EIF, Magnolia and MKP executed a Loan Agreement pursuant to which EIF provided funds for the acquisition of the assets and the installation of the Cyro–Plant. In connection with the financing and as a condition to the cancellation of a warrant granted to EIF under the Loan Agreement, Magnolia and MKP were required to obtain at least $500,000.00 of equipment lease financing from outside sources, on terms acceptable to EIF.

8. In conjunction with EIF's loan to Debtors in September, 1996, EIF reviewed and discussed with Debtors certain environmental reports advising that friable asbestos was present in the plant in an area not frequented by plant employees.

9. In September of 1996, Magnolia acquired the Macedonia Field compressor and the Dorcheat Field compressor, both of which had been installed previously and were in operation in the gas fields. Magnolia and MKP also entered into a construction contract with Knight Equipment & Manufacturing Company ("KEMCO") pursuant to which KEMCO refurbished and installed the Cryo–Plant as well as five compressors at Magnolia's plant and one compressor at MKP's plant.

10. MGTC is an Oklahoma limited liability company that was formed in or about June 1997 to acquire another pipeline system to supplement the existing operations of Magnolia and MKP. The members of MGTC were MKP and Magnolia, each of which owned one-half of the company. Okland was the manager of MGTC. MGTC was added as an obligor under the loan documents with EIF.

11. To cancel EIF's warrant, Magnolia and MKP obtained bids at arm's length from unrelated parties for leasing and/or financing arrangements for the eight compressors. Magnolia and MKP submitted to EIF three of the proposals for the sale and leaseback of the compressors. EIF approved the proposal from Hanover Compressor Company ("Hanover Proposal"). Subsequently, Magnolia and MKP proposed the formation of CSC, to be owned by the same members who owned Magnolia and MKP. CSC would provide the compressors through a sale and leaseback arrangement equivalent to the Hanover Proposal. EIF approved the proposal regarding CSC.

12. In June of 1997, CSC and Magnolia entered into a sale-leaseback transaction whereby CSC purchased from and leased back to Magnolia seven compressors. The lease ("Magnolia Lease") provided for a term of 36 months beginning June 1, 1997, at a total lease rate of $44,547.00 per month plus tax, for a total of $47,052.77. The respective monthly lease amounts, excluding taxes were: (a) Whiting Booster Compressor ($5,761.00); (b) Dorcheat Booster Compressor ($8,296.00); (c) Refrigeration Compressor ($8,296.00); (d) Residue Compressor ($4,079.00); (e) Overhead Compressor ($830.00); (f) Dorcheat Field Compressor ($8,642.00) (the "Dorcheat"); and (g) Macedonia Field Compressor ($8,642.00) (the "Macedonia"). At the same time, CSC and MKP also entered in a sale-leaseback transaction whereby CSC purchased and leased back to MKP one compressor (the "Inlet Compressor"). The lease ("MKP Lease") provided for a term of 36 months beginning June 1, 1997, at a lease rate of $13,453.00 per month plus tax, for a total of $14,209.73. The Compressor Leases contained no provisions regarding available remedies in case of their breach.

13. CSC paid the agreed purchase price to Magnolia and MKP for the eight compressors which aggregated approximately $1.45 Million Dollars. The Magnolia Lease and the MKP Lease (collectively, the "Compressor Leases" or "Leases") contained substantially similar terms to those in the Hanover Proposal.

14. The reasonable rental value for each compressor was the lease amount.

15. Under the Compressor Leases, Magnolia and MKP, respectively, expressly warranted to CSC that the compressors were operable and would be operable at the date of closing and had been maintained on a regular basis according to established maintenance requirements of Magnolia and MKP.

16. In conjunction with the Compressor Leases, CSC, Magnolia, and MKP, respectively, executed Total Maintenance Agreements (the "Maintenance Agreements"). The Maintenance Agreements were a material part of the leases. Under the Maintenance Agreements, CSC agreed to provide to Magnolia and MKP, respectively: "Lessor's Standard Maintenance Program" (which was not defined in the agreement) and all repairs, including overhauls of engines, compressors and cylinders. In the agreement CSC also guaranteed that the equipment would be mechanically available 95% of the time, in default of which the rental would be reduced proportionately. CSC was not entitled to any additional payment beyond the lease payment for providing maintenance under the Maintenance Agreements.

17. Under the terms of the Maintenance Agreements, Magnolia and MKP, respectively, were responsible for the "daily observation, operation and routine daily adjustments required for normal operation." Further, in the Compressor Leases, Magnolia and MKP, respectively, expressly agreed to indemnify, and hold CSC harmless from any claim, damage, or loss arising directly from or caused by Magnolia's or MKP's actions or omissions with regard to the compressors occurring after the closing date and Magnolia's and MKP's previous operation and ownership of the compressors prior to the closing date. At the time of the sale-leaseback transaction in June of 1997, Magnolia and MKP had not equipped the compressors with drip rails or secondary containment systems.

18. Following MKP's application therefor, and in August of 1998, an Operating Air Permit was issued to McKamie Gas Plant, permitting and governing MKP's operation of the sweetening plant, the Cyro–Plant, and the compressors related thereto.

19. The Inlet Compressor leased by MKP was necessary for Debtors' operations, being used for the production and sweetening of sour gas from MKP's wells in the McKamie–Patton Field, and the sweetening of third-party gas purchased and/or transported by Magnolia and MGTC, which was subsequently processed for liquids by Magnolia's Cyro–Plant. The seven compressors leased by Magnolia were necessary for Debtors' operations, being used for both Magnolia's and MGTC's purchase, processing and transportation of both sweet and sour gas in the area, to be sweetened by MKP and then, with MKP's gas, to be processed for liquids in Magnolia's Cyro–Plant and sold by Magnolia, MKP and MGTC downstream. Although MGTC was not a party to the Magnolia Lease, without the use of the Dorcheat Field and Macedonia Field compressors leased by CSC to Magnolia, MGTC could not have operated or transported gas at all. Each of the Debtors benefitted from the Compressor Leases.

20. From June 1997 through July 1999, all eight compressors were mechanically available for use in excess of 95% of the time. There were, however, oil leaks from the compressors during this period of time.

21. In June, 1998, CSC adopted a zero budget, and as a result it did not fund any further maintenance on the compressors unless required by a mechanical break down. Hence, routine preventative maintenance required under the Maintenance Agreements was not performed.

22. George N. Keeney, III ("Keeney"), former vice-president of Okland, testified that the Debtors had continued their operations through the fall of 1998, with MKP producing and processing gas and Magnolia and MGTC purchasing, transporting, processing and reselling gas. Keeney further testified that EIF continued to insist, through the fall of 1998, that the Debtors make the Cyro–Plant fully functional. He

stated that the events which led up to the Debtors' bankruptcies were MKP's loss of its main market, the decline of liquid and gas prices, and the general deterioration of the plant, all of which occurred in the fall of 1998.

23. On December 9, 1998, each of the Debtors filed Chapter 11 bankruptcy.

24. On the Petition Date, only three of the eight compressors were being operated: the Inlet Compressor (operated by MKP), and the Dorcheat Field and Macedonia Field compressors (operated by Magnolia).

25. Debtors continued in the use and possession of their businesses from the December 9, 1998 Petition Date until August 12, 1999.

26. On December 9, 1998, the Bankruptcy Court entered its Order Authorizing Use of Collateral by Debtors. On December 22, 1998, the Bankruptcy Court entered its Modified Interim Order Authorizing Use of Collateral by Debtors. Under those orders, Debtors were authorized to use cash collateral and to make payments in the ordinary course of their businesses.

27. By letter dated January 8, 1999, Debtors' counsel forwarded to EIF's counsel the Debtors' projected combined cash flow and supporting detail. The projected cash flows reflected MKP's fixed costs at $46,215.00, and the attached detail expressly reflected that the fixed expenses included $14,210.00 for the Inlet compressor lease payments. Likewise, the summary reflected that Magnolia's fixed costs were in the amount of $57,017.00, and the attached detail expressly reflected that the fixed expenses included the lease payment for the seven compressors in the amount of $47,052.00. This letter formed the basis for negotiations between Debtors' counsel and EIF's counsel for the Agreed Order Regarding Limited Use of Cash Collateral which was entered on January 21, 1999 ("Cash Collateral Order").

28. On January 12, 1999, the Debtors filed their schedules. Magnolia's schedules again reflected its fixed costs on a monthly basis to be in the amount of $57,017.00, and the attached detail specifically included the compressor lease payments to CSC for the seven compressors, totaling $47,052.00. Likewise, MKP's schedules reflected its fixed costs on a monthly basis to be in the amount of $46,215.00, and the attached detail specifically included the Inlet compressor lease payment to CSC in the amount of $14,210.00.

29. On January 21, 1999, EIF agreed to, and the Bankruptcy Court entered, the Cash Collateral Order. The Order authorized the Debtors to use the cash collateral on a line-item basis in compliance with the budget attached thereto, and it was effective from the Petition Date to and including March 31, 1999. While the budget attached failed to specifically refer to payments to CSC, it authorized the payment of MKP's fixed costs in the amount of $46,215.00 and Magnolia's fixed costs in the amount of $57,017.00 per month for each of the months of December, 1998, and January, February, and March of 1999. These amounts were the same as contained in the cash flow projections provided to EIF by debtors counsel which included full payments on the Compressor Leases. While counsel for EIF failed to attach the supporting detail to the Cash Collateral Order, the Court finds that EIF consented to and the Order authorized debtors to make full payments on the Compressor Leases for the months of December, 1998 through March, 1999.

30. In either late January or mid-February, 1999, (the precise date being unclear), EIF requested that CSC agree to take an amount less than it was entitled to under the Compressor Leases in an effort to reduce the Debtors' operating expenses for which EIF was providing funding. At that time, EIF also informed CSC that it was interested in acquiring the compressors, but needed to conduct due diligence to determine their condition, check market prices, and make an offer. It was ultimately agreed that while EIF was conducting its due diligence and deciding

about the possible purchase of compressors, CSC would accept partial payments from Debtors of $29,850.00 per month for the use of the compressors, plus $7200 per month for maintenance and other services. This amount of $29,850.00 represented the approximate amount of the debt service payment owed by CSC. It was further agreed that the debt service amount of $29,850.00 would be prospective in nature, commencing in March, 1999 and continuing thereafter, while the $7200 per month for maintenance costs would be retroactive to January and February, 1999 and continuing through March, 1999 and thereafter. This agreement was an oral agreement only, and there was no written modification of, or amendment to, the Compressor Leases. The Court finds that these changes in the lease payment amounts were intended to be temporary in nature, pending EIF's due diligence investigation and decision whether to offer to purchase the compressors. It was not the intention of the parties that the lease payments would be permanently modified.

31. CSC's books were adjusted to reflect the reduced compressor lease payment. CSC's bookkeeper understood that if the compressors were not ultimately purchased by EIF, the records would have to be re-adjusted to re-book and reflect the full amount of the lease payments.

32. As early as January, 1999, EIF had wanted Debtors to abate the asbestos and other environmental problems, if they existed, before EIF took over the collateral. EIF was concerned that it could be held responsible for asbestos remediation or other environmental liabilities if it took possession of the collateral before remediation. EIF had concluded that the preferable way to accomplish asbestos removal was to have the plant shut down while the asbestos removal was being conducted.

33. On February 26, 1999, the Bankruptcy Court entered the Order Regarding Obtaining Credit under 11 U.S.C. § 364 (the "First DIP Financing Order"). The order was approved by EIF. Exhibit "B" attached to the order reflected a summary

of expenses as of February 23, 1999. The summary showed the CSC compressor maintenance charges for January, 1999, through March, 1999 in the monthly amount of $7200.00 and the March, 1999 debt service payment in the amount of $29,850.00 as agreed by the parties.

34. On April 22, 1999, the Bankruptcy Court entered its Second Order Regarding Obtaining Credit under 11 U.S.C. § 364 (the "Second DIP Financing Order"). This order, which was approved by EIF, included as approved expenses the compressor lease payments to CSC of $29,850.00 per month for April and May, 1999, and monthly compressor maintenance charges of $7,200.00 for April and May, 1999. The order also required, as EIF had requested, that the MKP Plant be shut down until such time as was acceptable to EIF.

35. On April 23, 1999, Debtors, at EIF's request, temporarily ceased operations at the gas plant. However, both Debtors and EIF were concerned that an extended cessation of operations could cause a termination of some or all of MKP's underlying oil and gas leaseholds, resulting in a loss of oil and gas reserves valued at between one and several million dollars. EIF did not ask the Debtors to reject the MKP compressor lease in April 1999; rather, it authorized payment to CSC of the agreed reduced amounts for the month of May, 1999. The operation of the Inlet compressor was necessary for the recommencing of operations at the gas plant and the production from the MKP unit in order to preserve and protect MKP's leases and reserves.

36. EIF approved, and on May 20, 1999 the Bankruptcy Court entered its Third Order Regarding Obtaining Credit under 11 U.S.C. § 364 (the "Third DIP Financing Order"). Pursuant to the order, the Debtors were authorized to pay ordinary operating expenses and other expenses for the period from May 1, 1999 through July 31, 1999, as reflected in the budget attached thereto as Exhibit "B".

The attached budget authorized as fixed expenses the payment of $29,850.00 per month on the compressor leases and $7200.00 per month for compressor maintenance for the months of May, June and July, 1999, broken down as follows: $6,925.00 for the MKP Compressor Lease and $1,670.00 for MKP's maintenance payment and $22,925.00 for the Magnolia Compressor Lease and $5,530.00 for Magnolia's maintenance payment. Although the Order authorized the payments to CSC for May, it provided that the lease payments and maintenance fees for the months of June, 1999 and July, 1999, were not to be paid by the Debtors without prior written consent of EIF. The order further provided that the lack of a written agreement by 5:00 p.m. on May 28, 1999, between Debtors and CSC regarding the restructure of the arrangement on the compressor equipment would constitute an event of default. In such event, the Compressor Leases would be terminated upon notice by the Debtors, and the automatic stay of § 362 would terminate to permit CSC to pursue its rights and remedies in accordance with the terms of the Compressor Leases and applicable law.

37. Debtors and CSC failed to reach such agreement by the May 28, 1999 deadline, because the prospective purchaser of the compressor, EIF, was still conducting due diligence and was in the process of replacing its lead counsel. As a result, EIF stipulated and agreed that it waived the event of default, and the deadline for such an agreement was extended for a period of thirty days, or until June 28, 1999. EIF did not offer to purchase the compressors prior to the June 28 deadline but instead scheduled a meeting for July 9, 1999.

38. CSC filed its Requests for Payment of Administrative Claim on June 30, 1999, the bar date, seeking the payment of the balance of the postpetition rental payments due under the Compressor Leases.

The amounts claimed were for the period through April 30, 1999, in the amount of $48,252.86 against Magnolia's bankruptcy estate and $14,572.16 against MKP's. The amounts requested were increased on November 22, 1999, when CSC filed its Amended Requests for Payment of Administrative Claim. The amended requests included amounts claimed through August 31, 1999: $167,291.65 against Magnolia and $56,318.49 against MKP.[2]

39. At the July 9, 1999 meeting, EIF informed CSC it was not interested in purchasing the compressors.

40. Because EIF did not purchase the compressors, CSC made correcting adjusting entries on its books to restate the compressor rental income for March through June, 1999 from the reduced amount to the actual lease amounts. These entries were made when CSC's books were closed for its July 31, 1999 year, which occurred on or about September 2, 1999. These adjustments reflected the upward adjustment to the actual lease amount for each month and the application of all payments received from the Debtors, regardless of whether those payments were denominated maintenance or debt service.

41. After April 23, 1999, Debtors continued to operate two of the CSC compressors, the Dorcheat Field compressor and the Macedonia Field compressor. Debtors' continued operations were conducted with EIF's consent and were for the benefit of Debtors' estates and EIF. The Dorcheat and Macedonia compressors were necessary to continue the purchase, sale and transportation of gas by Magnolia and MGTC, which were the only remaining ongoing operations of the Debtors. Prior to July 20, 1999, EIF did not request that Debtors reject the Compressor Leases with CSC, nor did EIF take any action to cause the leases to be rejected.

2. CSC's trial documents reflect that it seeks payment for administrative claims for the period of December, 1998, through July 31, 1999, rather than August 31, 1999, as claimed in its amended requests.

42. EIF executive Donald Spencer testified that Debtors' continued operation and use of the Dorcheat and Macedonia compressors was beneficial to EIF because it preserved the relationship with third party gas producers, which would not have been maintained without the compressors. Spencer stated that EIF planned to do business with these producers in the future and wanted to accommodate them. EIF was further benefitted by the fact that it would not need to provide as much DIP financing if Debtors continued their operations.

43. On July 20, 1999, EIF requested for the first time that the Debtors give CSC notice of termination of the Compressor Leases and move to reject the same. On July 23, 1999, Debtors gave CSC such notice and on July 27, 1999, Debtors filed their Motion to Reject Executory Contracts. CSC objected to the rejection of the leases until the lease payments were paid in full as administrative expenses and the compressors were delivered to Oklahoma at Debtors' expense.

44. On August 6, 1999, Debtors filed an Emergency Motion for Appointment of Successor Management of Debtors and for Consideration of Requested Discontinuance of Operations. On August 12, 1999, the Bankruptcy Court entered its Order denying Debtors' motion and granting relief from the automatic stay to EIF. Okland resigned as the managing member of Debtors on August 12, 1999.

45. Prior to January of 1999, EIF had known of alleged environmental violations reported by Larry Hoss, a gas plant and compression specialist; nevertheless, it elected to enter into the Cash Collateral Order of January 21, 1999 to enable the Debtors to continue operations. In addition, EIF was aware of the alleged environmental violations contained in Rachel Pappworth's February 8, 1999 report, but elected to fund continuing operations by approval of the First DIP Financing Order of February 26, 1999. EIF failed to provide to the Debtors a copy of Pappworth's report prior to April 22, 2000. With full knowledge of the alleged environmental violations contained in Pappworth's report, EIF agreed to provide additional financing for the Debtors' operations pursuant to the entry of the Second DIP Financing Order April 22, 1999. Prior to the entry of each order, Debtors' counsel testified that the Debtors offered to convert the proceedings to Chapter 7 or "hand the keys" over to EIF, but EIF elected to continue to fund Debtors' operations, and the alleged ongoing environmental violations. After EIF took over the collateral in August 1999, EIF temporarily rented the allegedly leaking Dorcheat and Macedonia compressors from CSC. EIF agreed to pay rent of $16,000 per month, the original lease amount, until the compressors were replaced.

46. At trial, Ms. Pappworth did not opine concerning any economic damages actually suffered by Debtors as a result of alleged violations of the Operating Air Permit. She was not aware of any civil or criminal sanctions imposed upon the Debtors. She had concluded that the subsurface soils had not been significantly impacted by the operations at the Gas Plant, and that water samples collected from the final discharge point indicate the waters have not been impacted by petroleum hydrocarbons. She opined that if the compressors were operated in the future without leaks, alleged ground contamination would remediate over a period of time by natural remediation of the oil.

47. Had Magnolia earlier rejected its compressor lease with CSC, the operations of the Debtors would have ceased in their entirety. Various third-party operators of oil and gas properties depended on the availability of Magnolia's and MGTC's transmission system. As the operation of Debtors' gas transmission system was dependent upon the use of compressors, such oil and gas operators would have had no other options than to flare their gas, shut in their wells, or seek connections with other purchasers who were available in the area. EIF desired to maintain operations and the relationship with third-party pro-

ducers, because the third party producers' reserves were necessary for EIF's future operations of the collateral.

48. By its approval of cash collateral orders and Debtor–in–Possession financing orders and the providing of financing to the Debtors, EIF consented to the payments received by CSC postpetition, with the exception of one or two payments which were not authorized by court order, one of which has since been refunded by CSC.

49. EIF provided the funding for debtor's operations with knowledge that the compressors were leaking oil and that the Air Permit was being violated.

50. On June 23, 1999, CSC filed its proofs of claim in the amounts of $452,-204.00, against the Magnolia bankruptcy estate, and $49,734.09 against the MKP bankruptcy estate.

51. Based on historical records, MKP had made prepetition advances to CSC in the amount of $178,108.85, for CSC's payroll and to fund other operating expenses. Magnolia had advanced the sum of $5,006.91, for the same purposes. *See* Defendant's Exhibit # 171–F.

52. Prior to the Petition Date, MKP owed CSC the amount of $42,629.19, for past due payments under the MKP Lease. CSC was owed for past due lease payments under the Magnolia Lease the sum of $428,677.80. *Id.*

53. Debtors have paid CSC a total of $308,556.27 for alleged administrative charges: $236,987.20 by Magnolia and $71,569.08 by MKP. Postpetition, Magnolia advanced CSC the amount of $3,169.18, for purposes other than postpetition lease payments.

54. On October 14, 1999, the bankruptcy court entered its "Order Confirming Amended Liquidating Plans filed by Energy Income Fund, L.P."

55. Pursuant to the terms of the Liquidating Plan, allowed administrative expense claims were to be paid by the use of EIF's cash collateral. *See generally* First Amended Plans of Liquidation ("Liquidating Plan") at Art. VI, pp. 26–27.

56. Also pursuant to the terms of the Liquidating Plans "[g]eneral unsecured creditors [were] provided a specific fund for the recovery of their claims which will be distributed on a pro rata basis to the creditors of the respective Bankruptcy Estates." *Id.* The amount set aside for each fund was: $39,000 for Magnolia's unsecured creditors, $50,871 for MKP's unsecured creditors, and $4,000 for MGTC's unsecured creditors. *Id.*

57. The Liquidating Plans also authorized the Liquidator to exercise "all the rights and powers of the trustee under the Bankruptcy Code and Bankruptcy Rules" including "to bring any and all causes of action of the Debtor, including without limitation, causes of action authorized under Chapter 5 of the Bankruptcy Code, for preferences, for turnover, for fraudulent transfer, ...." *Id.* at Art. VII, ¶ 7.2

58. The Liquidating Plans identified the Liquidator as Robert Imel, a contract employee of Associated Energy Managers, Inc., an asset manager for EIF. *Id.* at ¶ 7.7.

59. To the extent that the court includes any factual findings in the remainder of this memorandum opinion that should more appropriately be included in these factual findings, they are incorporated herein by reference.

### Discussion

This court has subject matter jurisdiction over this action and personal jurisdiction over CSC, 28 U.S.C. § 1334, and this is a core proceeding. 28 U.S.C. § 157(b). Venue is proper in this court pursuant to 28 U.S.C. § 1409(a).

### A. *CSC's Motion to Dismiss for Lack of Standing*

Preliminarily, the court addresses the issue of standing as raised in the motion to dismiss. CSC contends that EIF lacks standing under § 1123(b)(3)(B)[3] to seek

---

**3.** *That section provides: "Subject to subsec-* tion (a) of this section, a plan may ... provide

the relief requested in the instant adversary complaint. Specifically, CSC alleges that only Robert Imel, who was appointed as Liquidator under the debtors' confirmed plans, possesses standing to object to claims, to avoid fraudulent conveyances or preferential transfers, to pursue equitable subordination or the other relief sought in the adversary complaint.[4] CSC argues that EIF cannot establish either that it has been appointed or that it is a representative of the estate.

■ In response, EIF advances two procedural arguments it claims supports the denial of CSC's motion to dismiss. First, EIF affirmatively argues that CSC's motion to dismiss is untimely in that it was filed outside the dispositive motion deadline of the November 1, 1999, Scheduling Order. In addition, EIF argues that CSC's failure to raise the affirmative defense of lack of standing in its Answer and Counterclaim filed on October 18, 1999, operates as a waiver of such defense under FED. R. CIV. P. 9(a), which is made applicable to adversary proceedings by way of FED. R. BANKR. P. 7009(a). Because the issue of standing has constitutional implications, however, as discussed *infra*,

the court declines to base any decision bearing thereon on any alleged procedural deficiencies. The court will instead address the merits of the standing issue.

EIF contends that it possesses statutory standing to object to CSC's administrative expense claims and proofs of claim under § 503(b),[5] 502(a)[6] and (d).[7] It further contends that it possesses standing to seek subordination of CSC's claims pursuant to § 510(c).[8] In response to CSC's § 1123(b)(3)(B) argument, EIF denies that it seeks avoidance of any transfer to CSC. Consequently, it contends, § 1123(b)(3)(B) does not apply, and CSC's motion to dismiss lacks merit.

■ The question of standing is a threshold issue in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The inquiry centers on the right to judicial relief and a concern about the role of courts in a democratic society. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. The standing doctrine

for ... the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." § 1123(b)(3)(B).

4. Under Tenth Circuit law, a non-debtor, non-trustee party must establish that it is a representative of the estate with authority to bring the action. *See Retail Marketing Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052 (10th Cir. 1993). "A party who is neither the debtor nor the trustee but who seeks to enforce a claim must establish two elements: (1) that it has been appointed; (2) that it is a representative of the estate." *Id.* at 1054 (quoting *Temex Energy, Inc. v. Hastie & Kirschner (In re Amarex)*, 96 B.R. 330, 334 (W.D.Okla.)).

5. Section 503(b) provides in pertinent part: "After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including ... the actual, necessary costs and expenses of preserving the estate...." *Id.*

6. That section states that "[a] claim or interest, proof of which is filed under section 501

of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects." § 502(a).

7. Section 502(d) authorizes a court to:

[D]isallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.
*Id.*

8. Section 510(c)(1) allows the court to equitably subordinate "for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

imposes both constitutional and prudential limitations upon federal court jurisdiction. *Warth,* 422 U.S. at 498, 95 S.Ct. 2197. The core component of standing, derived from the "case or controversy" requirement of Article III of the constitution, requires a plaintiff to "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

■ The other component of the standing doctrine, and the one arguably at issue here, involves judicially-imposed limitations, commonly referred to as prudential limitations, including the "[g]eneral prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen,* 468 U.S. at 751, 104 S.Ct. 3315. The "zone of interests" requirement has been referred to as "statutory standing." *Barnett Bank v. Trust Co. Bank (In re Ring* ), 178 B.R. 570 (Bankr.S.D.Ga.1995). Specifically, within the bankruptcy context, a court must inquire as to whether the Bankruptcy Code can be properly understood as granting the plaintiff in question the right to seek judicial relief for the alleged impropriety. *Id.*

■ CSC essentially argues that EIF lacks statutory standing inasmuch the authority to bring actions for avoidance and turnover belongs to the Liquidator, as derived under the terms of the Liquidating Plans. However, since the instant adversary complaint does not seek such relief, the court agrees with EIF's contention that § 1123(b)(3)(B) does not apply. In addition, the court further agrees with EIF that generally it possesses statutory standing under other provisions of the Bankruptcy Code as a result of its status as a secured creditor and a party in interest. The exception to EIF's statutory standing is, however, its request for disallowance of CSC's claims under § 502(d). The court will address the requirements for a finding of statutory standing in its discussion of EIF's claims brought pursuant to particular Code sections.

■ CSC contends *inter alia* that EIF lacks standing to proceed under § 502(d) because EIF is not a trustee, debtor, or a court-appointed representative of the estate with authority to bring avoidance actions. In response, EIF acknowledges that it is none of these but argues that the adversary complaint does not seek avoidance of alleged transfers; rather, its standing to object to claims under § 502(d) is set forth in § 502(a). That section provides that a "party in interest" has standing to object to claims. § 502(a). "Party in interest" means "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re FBN Food Servs., Inc.,* 82 F.3d 1387, 1391 (7th Cir.1996) (quoting *In re James Wilson Assocs.,* 965 F.2d 160, 169 (7th Cir.1992)).

Subsection (d) of § 502 provides, however, that:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity ... that is a transferee of a transfer avoidable under section ... 547 ... unless such entity or transferee has paid the amount or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

§ 506(d). Noticeably absent from this provision is the "party in interest" language.

Although § 502(d) has been construed to permit a claim objection to proceed even if an avoidance action cannot be pursued, the unavailability of the avoidance action generally resulted from the application of § 546(a)'s statutory limitations period for bringing avoidance actions. *See Committee of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.),* 143 B.R. 734 (9th Cir. BAP 1992); *In re Mid*

*Atlantic Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y.1986). As the rationale for permitting the defensive use of a time-barred claim under § 502(d) was so colorfully described by the *Mid Atlantic* court:

> [S]tatutory limitations periods generally have no application to offsetting counterclaims and other matters of defense, as opposed to actions seeking affirmative relief.... 'Limitation law is not intended to bar nor smother any mere defense of a party so as to compel him to stand dumb and mute while his antagonist bludgeons his head with every weapon in the book of legal, offensive warfare. For, so long as the courts will hear a plaintiff's cause of action, they will also hear a defendant's retort of vindication for the attitude he has assumed[.]'

*In re Mid Atlantic*, 60 B.R. at 610 (citations omitted)(quoting *Liter v. Hoagland*, 204 S.W.2d 219, 220, 305 Ky. 329, 331 (1947)). This rationale does not seem to apply to the issue of standing to proceed under § 502(d).

After much legal research on the issue of a creditor's standing under § 506(d), the court found only one case that specifically deals with the issue.[9] In *United Jersey Bank v. Morgan Guaranty Trust Co. (In re Prime Motor Inns, Inc.)*, 135 B.R. 917, 920 (Bankr.S.D.Fla.1992), the court first noted that § 506(d) does not incorporate the "party in interest" language found in § 502(a). After addressing the issue of "who may assert [an avoidance claim], whether offensively or defensively [under § 502(d) ]," the court held that the statutory language of § 547 cannot be circumvented "merely by asserting § 547 defensively." *Id.* at 921. The court stated:

> The correct analysis and reading of § 502(d) suggests to this Court that

[creditor-bank] might have standing to object under § 502(a) if there has first been a judicial determination that [claimants] have transferee liability within the meaning of § 550 of the Bankruptcy Code.... It is not enough for a creditor to establish a prima facie case of avoidability[.]

*Id.* Applying this rule of law to the instant case, the court finds that EIF, as a non-trustee, non-debtor, and non-representative of the estate, does not have standing to object to CSC's claims under § 502(d).

Further, the court notes that EIF failed to include any reference to § 506(d) or any alleged preferential or fraudulent transfers in its Proposed Findings of Fact and Conclusions of Law. And, at the post-trial oral argument on the parties' proposals, EIF's counsel failed to comment in any way on the evidence in this regard or to argue its legal significance. The court can only conclude that, based on the lack of attention paid, counsel for EIF tacitly conceded the issue.

**B.** *Claims Allowance*

**(i)** CSC's Administrative Expense Claim

CSC seeks the payment of administrative expense claims against Magnolia in the amount of $167,291.65, and against MKP in the amount of $56,318.49, which it claims are the amounts of the contractual lease payments from the Petition Date through August 31, 1999.[10] By way of its adversary complaint, EIF seeks *inter alia* a declaratory judgment that CSC is not entitled to these amounts as administrative claims. In response, by way of its counterclaim, CSC claims that it is entitled to

---

**9.** The case of *Sturgeon State Bank v. Perkey (In re Perkey)*, 194 B.R. 846 (Bankr.W.D.Mo. 1996), cited by EIF, fails to make reference to § 506(d). Rather, there the court recognized that the creditor-bank's standing to object to a proof of claim under § 502(a) and to object to the debtors' discharge under § 727(a) was "clear." *Id.* at 848. However, as previously recognized, the language of § 502(a) specifically grants standing to object to claims to

"part[ies] in interest." *Perkey* appears therefore inapplicable to the issue of standing under § 502(d).

**10.** Again, CSC's position at trial was that its administrative expense claims were through July 31, 1999, not August 31, 1999, as sought in its amended requests for payment of administrative claims.

allowance of these claims under § 503(b) and § 365(d)(10).[11]

 As an initial matter, administrative expense claims are subject to the review and potential objections of creditors and trustees. *McGuirl v. White*, 86 F.3d 1232, 1237 (D.C.Cir.1996). Consequently, given its status as a creditor, the court finds that EIF possesses standing to assert its objections to the administrative expense claims of CSC.

 As to the merits of the administrative claims, "[t]he presumption in bankruptcy cases is that the debtor's limited resources [are to] be equally distributed among the creditors. Thus, statutory priorities must be narrowly construed." *In re James B. Downing & Co.*, 94 B.R. 515, 519 (Bankr.N.D.Ill.1988)(citing *Joint Indus. Bd. v. U.S.*, 391 U.S. 224, 228, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968)). Accordingly, the burden of proving its entitlement to an administrative expense claim is on the claimant. *General American Transp. Corp. v. Martin (In re Mid Region Petroleum, Inc.)*, 1 F.3d 1130 (10th Cir.1993); *In re Amarex, Inc.*, 853 F.2d at 1530. *See Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1 (1st Cir. 1992). The standard of proof is preponderance of the evidence. *In re Hemingway Transport*, 954 F.2d at 5. *See In re Sunarhauserman, Inc.*, 184 B.R. 279 (Bankr.N.D.Ohio 1995), *aff'd*, 126 F.3d 811 (6th Cir.1997).

 To be deemed an administrative expense under § 503(b), the expense must (1) arise out of a transaction between the creditor and the debtor-in-possession, and (2) benefit the debtor-in-possession in the operation of the business. *Mid Region Petroleum*, 1 F.3d at 1133 (citing *In re Amarex*, 853 F.2d at 1530). The major-

ity view is that actual benefit, rather than potential benefit, to the estate is required. *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir.1994)(citing *In re ICS Cybernetics, Inc.*, 111 B.R. 32 (Bankr.N.D.N.Y. 1989)); *Burlington N. R.R. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700 (9th Cir.1988); *In re Allen Care Ctrs., Inc.*, 163 B.R. 180 (Bankr.D.Or. 1994); *Broadcast Corp. v. Broadfoot*, 54 B.R. 606 (N.D.Ga.1985), *aff'd in part, rev'd in part sub nom., In re Subscription Television*, 789 F.2d 1530 (11th Cir.1986). The focus is on whether a direct and quantifiable benefit flows to the estate and not on the amount of loss suffered by the claimant. *See Dant & Russell*, 853 F.2d at 706.

The minority view is that priority should be allowed to the extent the trustee has the opportunity to use the property even if he did not. *See In re Fred Sanders Co.*, 22 B.R. 902, 906 (Bankr.E.D.Mich. 1982)("The view that the estate should be liable only for the debtor's actual use or occupancy is based, in part at least, upon the premise that expenses of administration are to be minimized. The desire to keep a lid on expenses of administration is laudable, but an estate is not to be maintained for the debtor or creditor at the expense of those who have valid charges against property of the estate.")(quoting *Dayton Hydraulic Co. v. Felsenthall*, 116 F. 961, 965 (6th Cir.1902)). The rationale underlying the minority view is that the trustee had an opportunity to benefit from the continued possession postpetition of the property. Under Tenth Circuit law, however, "[a]lthough this opportunity is advantageous to the [trustee], it is not the type of benefit which is provided administrative expense protection because a benefit to the estate results only from use of

11. Section 365(d)(10) relates to unexpired personal property leases. It requires that: The trustee shall timely perform all of the obligations of the debtor, ... first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family,

or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof....
*Id.*

the ... property." *Mid Region Petroleum,* 1 F.3d at 1133 (creditor not entitled to § 503(b) administrative expense based on the mere opportunity to maintain possession postpetition of leased railcars or opportunity to sell debtor's business with the leases intact). This court is bound by Tenth Circuit law which follows the majority view as set forth in *Mid Region Petroleum.*

Section 503(b) must be read in conjunction with § 365(d)(10). Actual benefit to the estate is required for the first 60 days postpetition; however, after the expiration of the 60-day period, the trustee is required to timely perform all of the obligations of the debtor regardless of benefit to the estate. *See* § 365(d)(10). *See also, In re Russell Cave Co., Inc.,* 247 B.R. 656, 659 (Bankr.E.D.Ky.2000) ("[T]he purpose of § 365(d)(10) is to mandate the performance of the debtor's obligations under an unexpired lease, beginning at the 60th day after filing"); *In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 805 (Bankr.D.Del.1997) ("[I]f the Lease Agreement constitutes a true lease [rather than a security agreement], Debtor must perform its obligations thereunder until it is assumed or rejected"). Relief from the timely performance rule of § 365(d)(10) results only from a court's ordering otherwise "based on the equities of the case."

### (a) *First 60-day period postpetition*

Pursuant to the MKP Lease, MKP leased the Inlet Compressor from CSC for a monthly rental of $13,453.00, plus tax, for a total of $14,209.73. The Inlet Compressor was operated from the Petition Date until April 23, 1999, when the gas plant was shut down at the request of EIF.

Pursuant to the Magnolia Lease, Magnolia leased seven compressors from CSC for a monthly rental of $44,547.00, plus tax, for a total of $47,052.77. From the Petition Date until the rejection of the leases, only two compressors Magnolia was leasing, the Dorcheat and the Macedonia, were operating. The monthly rental for each of these two compressors was $8,642.00, plus tax.

Debtors used only three compressors during the first 60 days postpetition. Although CSC argues that the remaining five compressors were mechanically available under the Leases, they were not in fact operated during this time. Thus, the court finds that the estate was benefitted only by the compressors actually used for the first 60 days postpetition. Similarly, the court finds the estate did not benefit simply as a result of the remaining five compressors' availability for use. CSC is entitled to an administrative claim only as to those compressors actually operated.

As to the particular amounts to be allowed to CSC as an administrative expense claim, the parties agree that the reasonable rental value for each compressor was the amount stated in the Compressor Leases. Therefore, for the first 60 days postpetition, the maximum allowable claim against the estate is the following:

| | |
|---|---|
| Dorcheat Compressor ($8,642.00 × 2 months) = | $17,284.00 |
| Macedonia Compressor ($8,642.00 × 2 months) = | 17,284.00 |
| Amount Due to CSC from Magnolia (pretax) | $34,568.00 |
| Tax (5.625% rate) | 1,944.45 |
| Total Amount Due to CSC from Magnolia | $36,512.45 |
| | |
| Inlet Compressor ($13,453.00 × 2 months) = | $26,906.00 |
| Amount Due to CSC from MKP (pretax) | $26,906.00 |
| Tax (5.625% rate) | 1,513.46 |
| Total Amount Due to CSC from MKP | $28,419.46 |

### (b) *Time period from and after first 60 days postpetition*

Under § 365(d)(10), debtors were obligated to timely perform under the Compressor Leases until the date of assumption or rejection "unless the court ... based on the equities of the case, orders otherwise...." To determine the amount of the obligation, then, the court must first resort to the original lease amounts. For all eight compressors under both the Magnolia Lease and the MKP Lease, the origi-

nal amounts totaled a monthly lease obligation of $58,000.00, plus tax.

■ EIF contends that this amount should be reduced "based on the equities of the case." Although there is little, if any, guidance concerning factors the court should consider in determining the "equities of the case," the court must weigh the totality of the circumstances in light of the effect on the estate of the administrative claimant's alleged inequitable conduct. Indeed, since administrative claims are typically paid from assets that would otherwise be distributed to unsecured creditors, the court should normally consider the claimant's inequitable conduct vis-a-vis the class of unsecured creditors.

■ However, these cases present a factual scenario that compels a different comparison. Here, liquidating Chapter 11 plans have been confirmed. Under the terms of the Liquidating Plans, EIF is responsible for the payment of court-approved administrative claims. The plans create a separate fund of a specified amount[12] respectively, whereby unsecured creditors' claims will be paid on a *pro rata* basis. Consequently, only EIF, and not the class of unsecured creditors, stands to be harmed by the allowance of CSC's administrative claims. The court should thus appropriately weigh the equities as between CSC and EIF to determine the "equities of the case" under § 365(d)(10). In that context, the court turns to EIF's equity arguments.

■ The first equitable factor EIF identifies in support of such reduction is the lack of benefit to the estate as a result of Debtors' failure to operate postpetition five of the eight compressors and the non-operation of the Inlet Compressor after April 23, 1999, the date the gas plant was shut down. EIF requests basically that the court ignore the language of § 365(d)(10) and apply the § 503(b) "benefit conferred" test to the post-60-day postpetition time period. The court declines such request for the reason that Congress could have simply carried § 503(b)'s "benefit conferred" test through the date of assumption or rejection of the lease, but it clearly chose not to based on its enactment of § 365(d)(10). Where a "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Ents., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(quoting *Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). In addition, equity should not trump a specifically applicable section of the Bankruptcy Code. *In re Fesco Plastics Corp.*, 996 F.2d 152 (7th Cir.1993)(a court may not disregard a specific Code section and instead employ its equitable powers to achieve a result not contemplated by the Code). *See Viking Assocs., L.L.C. v. Drewes (In re Olson)*, 120 F.3d 98 (8th Cir.1997); *Coie v. Sadkin (In re Sadkin )*, 36 F.3d 473 (5th Cir.1994).

EIF next argues that CSC is an insider of the Debtors. The transactions in this case were by and between insiders, EIF urges, and CSC took advantage of the insider relationships. In response, CSC denies that an insider relationship existed between it and the Debtors based on the doctrine of judicial estoppel.[13]

---

12. The terms of the plans provide for different amounts per plan.

13. Specifically, CSC argues that EIF previously represented to the bankruptcy court that the compressors were leased from an outside lessor. *See* Defendant's Exhibit # I–1—Response/Objection to Motion to Convert to Chapter 7 or to Dismiss at ¶ 1 (emphasis added)("Recent negotiations have focused on the handling of a number of gas compressors which the Debtors *have on lease from an outside lessor.*"). Based on this representation, CSC argues that EIF should be judicially estopped from now claiming CSC is an insider of the Debtors.

Judicial estoppel bars a party from adopting inconsistent positions in the same or related litigation. *United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir.1986). The Tenth Circuit has rejected the doctrine, however, finding it preferable to determine "cases on the basis of the true facts as they may be established ultimately." *Id.* (quoting *Parkinson v. California Co.*, 233 F.2d 432, 438 (10th Cir.1956)). *See also Golfland Entertainment Ctrs., Inc. v. Peak Investment, Inc. (In re BCD Corp.)*, 119 F.3d 852 (10th Cir.1997).

Section 101(31) of the Bankruptcy Code defines an "insider" as including an "affiliate, or insider of an affiliate as if such affiliate were the debtor[.]" The definition of "affiliate" as found in subsection (2) means an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor," with certain exceptions not relevant here. § 101(2).

In light of these provisions and, as a result of Debtors' and CSC's shared majority and controlling member, Okland, the court finds that CSC and Debtors are insiders within the definition of the Code. The significance of this finding and its application to the equities of the case are not significant, however, in light of EIF's knowledge of and acquiescence in the transactions of which it complains. In this regard, EIF complains that Debtors failed to reject the MKP Lease after the Inlet Compressor was shut down and failed to take action to collect a credit balance CSC owed MKP. Instead, MKP continued to pay CSC. Furthermore, EIF alleges that the transactions among Debtors and CSC were done for the benefit of the insiders and to the detriment of the estate.

 While EIF correctly states that transactions between insiders are subject to closer scrutiny than those between non-insiders, the insider relationship standing alone does not constitute inequitable conduct. Something more must be shown. The inequitable conduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant. *Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *Pepper*

*v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).[14]

EIF complains that Debtors failed to move to reject the compressor leases prior to July, 1999, after the Inlet compressor was shut down. Even after the Inlet compressor was shut down in April 1999, Debtors did not seek rejection of the MKP lease. The court declines to find that Debtors' failure to seek rejection of the leases prior to July, 1999 constitutes inequitable conduct. This results from its finding that, during the pendency of the bankruptcy proceedings, EIF was exploring the possibility of purchasing the compressors. Debtors' failure to reject the Compressor Leases prior to EIF's decision to refrain from such purchase benefitted EIF, allowing it time to pursue its options.

EIF was the primary secured lender to Debtor, both pre and postpetition. EIF's consent was obtained to the Debtors' formation of CSC as the entity to purchase the compressors from Debtors and lease them back. At the time MKP and Magnolia formed CSC, EIF was aware that the new entity would be owned by the same members that owned Magnolia and MKP.

EIF knowingly consented to the entry of the various cash collateral orders and the three DIP Financing Orders. Pursuant to these Orders, EIF consented to Debtors making full payments on the compressor leases for the months of December, 1998 through March, 1999, and a reduced monthly amount through May, 1999.

In light of these circumstances, EIF can hardly complain about the insider relationship between Debtors and CSC or about transactions of which it had full knowledge and to which it consented. The insider

Even if estoppel could apply under Tenth Circuit law, in order to maintain an estoppel defense, a party must demonstrate "a detrimental change in its position as a result of reasonable reliance on that conduct." *Paul v. Monts,* 906 F.2d 1468, 1474 (10th Cir.1990). CSC has not made such a showing in this case. For these reasons, the court rejects CSC's denial of its insider status based on the doctrine of judicial estoppel.

14. The court recognizes that these cases relate to the issue of equitable subordination under § 510(c). The concept of equity as set forth in both §§ 365(d)(1) and 510(c) is sufficiently similar that the court looks to equitable subordination cases for guidance. The remedies available under the two sections are different, however. Section 365(d)(10) speaks to disallowance of a claim, whereas § 510(c) permits the court to reorder the priority of an allowed claim.

relationship constitutes no basis for disallowance of CSC's § 365(d)(10) administrative claims based on the equities of the case.

EIF next argues that Debtors and CSC agreed to a postpetition modification of the lease amounts. Thus, it urges, CSC is not entitled to assert administrative claims based on the original contract rate. The court finds, however, that the lease terms were not modified. In January or February, 1999 the parties agreed that the lease amounts would be reduced to an amount equal to CSC's monthly debt service requirement, plus a maintenance fee. The reduced amounts were $29,850.00 in lease payments and $7200.00 for maintenance. These reduced amounts are reflected in the various orders entered by the bankruptcy court. The agreement to reduce the lease amounts resulted from EIF's unwillingness to fund Debtors' payment of the entire amount after February, 1999. Therefore, the parties agreed that the payment amount would be reduced to CSC's debt service amount, plus the maintenance fee.

CSC asserts it informed EIF that, in agreeing to the reduced payment, it reserved the right to submit administrative claims for the difference between the amount due under the leases and the agreed-upon reduced payment. Debtors' counsel, Judy Morse, mentions this probability in correspondence with EIF on April 29, 1999. *See* Plaintiff's Exhibit # 175. EIF counters that it would not have agreed to the reduced amount if the reduction had been only temporary, and not permanent.

 The court observes that the parties to these postpetition negotiations are sufficiently sophisticated to have entered into written modifications of the Compressor Leases if, in fact, the reductions were intended to modify the original lease terms. The court finds it is quite reasonable that the reductions were for an interim period only while EIF was considering whether to purchase the compressors and during the period when there were discussions concerning a possible consensual reorganization plan. Keeney testified, and the court finds, that the agreement was that, if EIF ultimately agreed to purchase the compressors, the difference between the lease payment amount and the reduced amount would be worked out in the purchase price. The court further finds based on Keeney's testimony that, by agreeing to the reduced amount, CSC did not intend to waive any amounts of its administrative claims if EIF did not ultimately agree to purchase the compressors. No agreements were reached in either of these regards, however, and CSC later made adjusting entries to its books reflecting the full amounts due under the Compressor Leases.[15] The

**15.** On these same facts, EIF argues that CSC should be estopped, by the application of the doctrine of promissory estoppel under Oklahoma law, to assert administrative claims for the balance. Promissory estoppel is based on the RESTATEMENT (SECOND) OF CONTRACTS § 90, and has been incorporated into *Oklahoma common law. The Restatement* defines the doctrine as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." *Id. See Russell v. Board of County Comm'rs.,* 952 P.2d 492 (Okla.1997). The elements necessary to establish promissory estoppel are:

(1) A clear and unambiguous promise;

(2) Foreseeability by the promisor that the promisee would rely upon it;

(3) Reasonable reliance upon the promise to the promisee's detriment; and,

(4) Hardship or unfairness can be avoided only by the promise's enforcement.

*Russell,* 952 P.2d at 503.

As to the first element, the court has found that representatives of CSC did not agree to be bound to the reduced amount. Instead, CSC agreed that its acceptance of the reduced amount was temporary, not permanent, and would be compensated for based on future developments. Therefore, EIF cannot establish the first element of promissory estoppel.

In addition, the court questions whether EIF has demonstrated detrimental reliance, the third element. As the court has found, EIF benefitted from the continued operation and availability of the compressors, which

court finds that the terms of the Compressor Leases were not modified as a result of the parties' February 1999 oral agreement. Therefore, CSC's seeking an administrative expense claim for the full amount of the lease does not bear upon the equities of this case under § 365(d)(10).

Finally, EIF contends that the court should "order otherwise" under § 365(d)(10) based on the equities of the case as a result of Debtors' and CSC's alleged environmental violations. Specifically, EIF alleges that both Debtors and CSC were responsible for violations of the Operating Air Permit issued to the McKamie Gas Plant by allowing the flaring of $H_2S$ gas in alleged violation of state and federal law.[16]

With regard to the alleged environmental violations under § 365(d)(10) the court must again view the equities in the context of the postpetition conduct of CSC as compared to EIF's conduct.[17] The testimony of both Rachel Pappworth, of Sound Environmental Solutions, and Ernest Rymer, the representative of the Arkansas Department of Environmental Quality, confirmed the existence of environmental concerns at the gas plant. However, EIF was aware of these concerns during the time it was providing the postpetition of Debtors' operations. Such knowledge did not cause EIF to withhold financing. Thus, EIF's financing perpetuated the environmental problems about which it now complains while providing to EIF time within which to make decisions regarding purchasing the compressors from CSC and taking over its collateral. EIF benefitted from the operations' continuation until such time

as it informed CSC it was not going to purchase the compressors. As between EIF and CSC, the equities militate against EIF.

Furthermore, there is simply no evidence that the estate has been harmed by the alleged environmental violations. Ms. Pappworth did not opine concerning any economic damages actually suffered by Magnolia or MKP. She was unaware of any civil or criminal sanctions that were imposed upon Debtors. Thus, the estate suffered no harm: no fines or penalties were assessed, and there was no evidence of state or federal remediation requirements imposed upon EIF on a going-forward basis after it assumed the collateral.

As to the administrative claim, the court concludes that the equities of the case do not require it to "order otherwise" under § 365(d)(10). Therefore, the court allows CSC's administrative claim for payments at the rate specified in the Compressor Leases for all eight compressors from and after sixty (60) days until rejection (2/1/99—7/31/99).

Those amounts are as follows:

| | |
|---|---|
| Magnolia (7 compressors) $ 44,547.00 × 6 months = | $267,282.00 |
| MKP (1 compressor) $13,453.00 × 6 months = | 80,718.00 |
| Total (pretax) | $348,000.00 |
| Tax (5.625% rate) | 19,575.00 |
| Total | $367,575.00 |

The total amount of administrative claim owed to CSC from MKP is as follows:

| | |
|---|---|
| 1st 60 days (including tax) | $ 28,419.46 |
| After 60 days (including tax) | 85,258.39 |
| Total | $113,677.85 |
| Less payments | 71,569.07 |
| Claim Allowed | $ 42,108.78 |

---

benefit was achieved by CSC's agreement to accept a reduced payment amount. EIF bought itself time and cannot now be heard to complain that CSC filed administrative expense claims for the balance.

16. EIF has heretofore complained concerning CSC's alleged complicity in other environmental violations in addition to the flaring of gases, i.e., leaking compressors and the presence of friable asbestos at the Gas Plant. However, EIF failed to address these other allegations in its Proposed Findings of Fact

and Conclusions of Law. *See* EIF's Proposed Findings and Conclusions at p. 18. Accordingly, the court concludes that EIF tacitly concedes these allegations and will address only the issue of flaring of gas as it relates to the issue of equity under § 365(d)(10).

17. For purposes of this discussion, the court assumes, without deciding, that CSC can be liable for violations of environmental laws as an owner and operator of the compressors under relevant state and federal laws.

The total amount of administrative claim owed to CSC from Magnolia is as follows:

| | |
|---|---:|
| 1st 60 days (including tax) | $ 36,512.45 |
| After 60 days (including tax) | 282,316.61 |
| Total | $318,829.06 |
| Less payments | 236,987.20 |
| | $ 81,841.86 |
| Less Advance | 3,169.18 |
| Claim Allowed | $ 78,672.68 |

### (ii) *Prepetition Claims*

Section 501 of the Code allows a "creditor or an indentured trustee [to] file a proof of claim." Section 502(a) provides that a "claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."

### (a) *CSC's Proofs of Claim*

In the present case, CSC filed a proof of claim in the Magnolia bankruptcy in the amount of $452,204.00 and in the MKP bankruptcy in the amount of $49,734.09. By way of its counterclaim in this adversary proceeding, CSC sought the allowance of its proofs of claim.

The evidence at trial established that, on the Petition Date, and excluding CSC's alleged lease rejection claim, CSC owed MKP $178,108.85 for advances made by MKP to cover payroll and other expenses of CSC. MKP owed CSC payments under the MKP Lease of $42,629.19. These prepetition amounts may be set off against each other pursuant to § 553(a). The result is that CSC owed MKP the net sum of $135,479.66.

Also on the Petition Date, CSC owed Magnolia $5,006.91 for advances made by Magnolia to cover payroll and other expenses of CSC. Magnolia owed CSC payments under the Magnolia Lease in the sum of $428,677.80. After setoff, Magnolia owed CSC on the Petition Date the sum of $423,670.89.

On the Petition Date, CSC owed MGTC for advances in the amount of $64,859.67. MGTC is not a lessee of any of the compressors and consequently owed no lease payments. There was no evidence that MGTC was otherwise indebted to CSC. Thus, CSC does not have a prepetition claim against MGTC.

### (b) *Lease Rejection Claim*

Also before the court is CSC's pre-petition lease rejection claim under § 365(a).[18] Under this Code provision, a trustee may reject an executory contract to which the debtor is a party. If the contract is rejected, it is deemed to constitute a breach of the contract that occurred immediately prior to the filing of the petition. *In re United Nesco Container Corp.*, 47 B.R. 230 (Bankr.E.D.Pa.1985). The claim arising from the rejection of an unexpired lease is governed by § 502(g).[19] The lessor is thus given a prepetition claim for damages arising from such breach, typically measured by the terms of contract and applicable state law.

The terms of the subject Compressor Leases do not address remedies in the event of breach of the leases. However, CSC seeks damages for Debtors' rejection of the Compressor Leases for the period from the date of rejection (August 1, 1999) to their contractual termination date (May 30, 2000). EIF does not dispute either of these dates.[20] Thus, CSC's lease rejection

---

**18.** Section 365(a) states that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *Id.*

**19.** That section provides:

A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) of (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

§ 502(g).

**20.** Other than contesting CSC's entitlement to the allowance of any claims generally, EIF fails to argue a defense that might limit the amount of lease rejection damages. For example, EIF does not contend that CSC failed to mitigate its damages, or that the total

damages should be the contract rate times the remaining term of the leases. The calculation is as follows:

Lease Rejection Claim against Magnolia:

$47,052.77 × 10 months = $470,527.70

Lease Rejection Claim against MKP:

$14,209.73 × 10 months = $142,097.30

■ Additionally, the lease rejection claims may be offset against any sums owed by CSC prepetition. Thus, the total amount of CSC's prepetition claims against the Debtors separately are:

MKP

| | |
|---|---:|
| CSC owes MKP (for advances) | ($178,108.85) |
| MKP owed CSC (for lease payments) | 42,629.19 |
| CSC owes MKP (net before Lease Rejection Claim) | ($135,479.66) |
| Lease Rejection Claim | 142,097.30 |
| MKP owes CSC (after Lease Rejection Claim) | $ 6,617.64 |

Magnolia

| | |
|---|---:|
| CSC owes Magnolia (for advances) | ($ 5,006.91) |
| Magnolia owes CSC (for lease payments) | 428,677.80 |
| Magnolia owes CSC (net before Lease Rejection Claim) | $423,670.89 |
| Lease Rejection Claim | 470,527.70 |
| Magnolia owes CSC (after Lease Rejection Claim) | $894,198.59 |

## C. *Setoff*

EIF contends that, to the extent it is allowed, CSC's administrative expense claim is subject to set off against prepetition amounts that CSC owed to Debtors. In support of its contention, EIF cites § 553 of the Code.[21]

■ Significantly, setoff is available in bankruptcy only when the obligations between debtor and creditor are mutual. The Tenth Circuit has described the doctrine of set off as granting "a creditor the right[22] 'to offset a mutual debt owing by such creditor to the debtor' so long as both debts arose prepetition and are indeed mutual." *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th Cir. 1990) (quoting *Tradex, Inc. v. U.S. (In re IML Freight, Inc.)*, 65 B.R. 788, 791 (Bankr.D.Utah 1986)). Thus, setoff is available only when the mutuality requirement is satisfied.

■ In the present case, EIF seeks to require CSC to offset its postpetition administrative claims against alleged prepetition indebtedness. The doctrine of setoff under § 553 is unavailable in this context. The court should deny EIF's request on this basis.

However, as the court's previous analysis of CSC's prepetition claims reveals, treating the Debtors' estates separately[23] and taking into account the lease rejection claims, CSC is not indebted to Magnolia and MKP, the Debtors against which CSC's administrative claim has been allowed. Section 553 setoff is simply unavailable on these facts.[24]

should be discounted so as to arrive at the present value of CSC's lease rejection claim.

**21.** That section provides generally that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...." § 553(a).

**22.** Of course, in this case, CSC, the creditor with the claims allegedly subject to setoff, is not claiming the *right* to do so. Rather, EIF seeks to force CSC to offset its administrative claim against its alleged prepetition indebtedness.

**23.** In this case, Debtors' estates are being jointly administered but have not been substantively consolidated. The court has considered CSC's claims against each Debtor separately, and vice versa. This is consistent with its prior treatment of CSC's administrative claims.

**24.** In contrast, the doctrine of recoupment permits prepetition and postpetition claims to be offset against each other so long as the claims arose out of the same transaction. *See Davidovich*, 901 F.2d at 1537. CSC's postpetition claims against Magnolia and MKP are for rental payments arising out of the Compressor Leases. The prepetition amounts CSC owes to Magnolia and MKP represent advances made to cover CSC's payroll and other operating expenses. Clearly, these claims do not arise out of the same transaction. Although EIF did not plead the applica-

### D. *Equitable Subordination*

Section 510(c) of the Code permits the bankruptcy court, after notice and hearing, "under the principles of equitable subordination, [to] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." *Id.* Thus, subordination is an equitable remedy in which the order of payment, rather than the existence of the debt, is in issue. All or part of a claim may be subordinated to all or part of another claim.

A secured creditor has standing to seek equitable subordination of another creditor's claim. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990) ("[I]ndividual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest."); *Weeks v. Kinslow (In re Weeks)*, 28 B.R. 958, 960 (Bankr.W.D.Okla.1983) ("[T]he proper party to seek equitable subordination is the creditor or the trustee acting as representative of the creditor, not the debtor."). Thus, EIF as the primary secured creditor in this case possesses standing to seek equitable subordination of CSC's claims.

The doctrine of equitable subordination is remedial, not penal, in nature and "should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct". *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991). In addition, even if the court finds that the circumstances of the case might justify the subordination of a claim, the court is permitted, but not required, to do so. *Id.* at 1465 n. 9.

The burden of proof required to prove equitable subordination is less demanding when the claimant is an insider. In this circumstance, "the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be equitable subordinated." *Estes v. N & D Props., Inc. (In re N & D Props., Inc.)*, 799 F.2d 726, 731 (11th Cir.1986). However, insider status alone is insufficient to warrant subordination. *In re Fabricators*, 926 F.2d at 1467. The focus is whether the insider's conduct unfairly injured creditors or gave the insider an unfair advantage.

Once insider status is established, the court must address the following three elements from *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (1977):

1. The claimant must have engaged in some type of inequitable conduct;
 a. fraud, illegality or breach of fiduciary duties;
 b. undercapitalization;
 c. a claimant's use of the debtor as a mere instrumentality or alter ego;
2. The misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and,
3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*Id.* These requirements were recently reiterated by the United States Supreme Court in *United States v. Noland*, 517 U.S. 535, 538, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996).

These factors are similar to those previously addressed by the court in its discussion of the "equities of the case" in the context of § 365(d)(10). The court hereby incorporates that discussion herein by reference.

Another issue that arises in the instant case is whether equitable subordination of CSC's claims is appropriate based on al-

tion of the doctrine of recoupment, it is un-

available on the present facts.

leged postpetition conduct. To a substantial extent, the alleged inequitable conduct of which EIF complains occurred subsequent to the Petition Date. The court in *Ansel Properties, Inc. v. Nutri/System of Florida Assocs. (In re Nutri/System of Florida Assocs.)*, 178 B.R. 645 (E.D.Pa. 1995), refused to rule as a matter of law that equitable subordination can never apply to postpetition conduct, stating that such limitation should originate from Congress. *Id.* at 657. Yet, the court recognized that "all the protections and parties which come into play once a debtor enters bankruptcy—i.e. the bankruptcy court, secured and unsecured creditors, a trustee—make the occurrence of equitable subordination based on postpetition conduct unlikely." *Id. But see Principal Mutual Life Ins. Co. v. Langhorne (In re 848 Brickell Ltd.)*, 243 B.R. 142 (S.D.Fla.1998) (secured creditor's abusive litigation tactics postpetition harmed the estate and justified equitably subordinating secured creditor's administrative claims to the administrative claims of Chapter 11 trustee and his counsel). In any event, for the reasons discussed previously, the court declines to equitably subordinate CSC's claims, as requested by EIF.

### E. *Unclean Hands*

■■■■■ EIF contends that CSC's postpetition conduct deprives it of the "clean hands" necessary to seek an equitable remedy. The general principle of equity is that "he who seeks equity must come into the court with clean hands." *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1486 (10th Cir.1991). As an equitable doctrine, the application of unclean hands rests within the sound discretion of the court. *New Valley Corp. v. Corporate Property Assocs. (In re New Valley Corp.)*, 181 F.3d 517 (3rd Cir.1999), *cert. denied*, 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000).[25] This doctrine has been ap-

plied in the context of a bankruptcy administrative expense claim. *In re Sanborn*, 181 B.R. 683 (Bankr.D.Mass.1995).

■■■ The alleged inequitable conduct of which EIF complains in this regard is the post-rejection adjustment of CSC's books to reflect an administrative expense claim for the entire amounts due under the Compressor Leases, rather than the reduced amounts, as previously discussed. These adjusting entries, the court has found, were made when CSC's books were closed for its July 31, 1999, fiscal year on or about September 2, 1999, and were precipitated by EIF's informing CSC that it was not interested in purchasing the compressors. At that point, the balance of the reduced payment amounts and the actual lease amounts could not be made up in the purchase price of the compressors, as was anticipated by CSC. On these facts, the court concludes that the doctrine of unclean hands does not mandate the disallowance of CSC's claims.

### F. *Further issues*

The court has considered the other issues included in the parties' Proposed Findings of Fact and Conclusions of Law, and, to the extent they are not addressed in this opinion, the court finds them to be without merit.

For these reasons, the court finds in favor of EIF, in part, and against CSC, in part, on EIF's adversary complaint, and in favor of CSC, in part, and against EIF, in part, on CSC's counterclaim. A judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

**25.** In support, EIF cites the District Court opinion of *New Valley Corp. v. Corporate Property Assocs. (In re New Valley Corp.)*, 222 B.R. 722 (D.N.J.1998), which was reversed on appeal to the Third Circuit at *New Valley Corp. v. Corporate Property Assocs. (In re New Valley Corp.)*, 181 F.3d 517 (3rd Cir.1999), *cert. denied*, 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000). The court cites to the circuit opinion.